(Slip Opinion) OCTOBER TERM, 2020 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CANIGLIA *v.* STROM ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 20–157. Argued March 24, 2021—Decided May 17, 2021

During an argument with his wife, petitioner Edward Caniglia placed a handgun on the dining room table and asked his wife to "shoot [him] and get it over with." His wife instead left the home and spent the night at a hotel. The next morning, she was unable to reach her husband by phone, so she called the police to request a welfare check. The responding officers accompanied Caniglia's wife to the home, where they encountered Caniglia on the porch. The officers called an ambulance based on the belief that Caniglia posed a risk to himself or others. Caniglia agreed to go to the hospital for a psychiatric evaluation on the condition that the officers not confiscate his firearms. But once Caniglia left, the officers located and seized his weapons. Caniglia sued, claiming that the officers had entered his home and seized him and his firearms without a warrant in violation of the Fourth Amendment. The District Court granted summary judgment to the officers. The First Circuit affirmed, extrapolating from the Court's decision in *Cady* v. *Dombrowski,* 413 U. S. 433, a theory that the officers' removal of Caniglia and his firearms from his home was justified by a "community caretaking exception" to the warrant requirement.

*Held*: Neither the holding nor logic of *Cady* justifies such warrantless searches and seizures in the home. *Cady* held that a warrantless search of an impounded vehicle for an unsecured firearm did not violate the Fourth Amendment. In reaching this conclusion, the Court noted that the officers who patrol the "public highways" are often called to discharge noncriminal "community caretaking functions," such as responding to disabled vehicles or investigating accidents. 413 U. S., at 441. But searches of vehicles and homes are constitutionally different, as the *Cady* opinion repeatedly stressed. *Id.,* at 439, 440– 442. The very core of the Fourth Amendment's guarantee is the right

of a person to retreat into his or her home and "there be free from un-
reasonable governmental intrusion." *Florida* v. *Jardines*, 569 U. S. 1,
6. A recognition of the existence of "community caretaking" tasks, like
rendering aid to motorists in disabled vehicles, is not an open-ended
license to perform them anywhere. Pp. 3–4.

953 F. 3d 112, vacated and remanded.

THOMAS, J., delivered the opinion for a unanimous Court. ROBERTS,
C. J., filed a concurring opinion, in which BREYER, J., joined. ALITO, J.,
and KAVANAUGH, J., filed concurring opinions.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 20–157

EDWARD A. CANIGLIA, PETITIONER *v.*
ROBERT F. STROM, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[May 17, 2021]

JUSTICE THOMAS delivered the opinion of the Court.

Decades ago, this Court held that a warrantless search of an impounded vehicle for an unsecured firearm did not violate the Fourth Amendment. *Cady* v. *Dombrowski*, 413 U. S. 433 (1973). In reaching this conclusion, the Court observed that police officers who patrol the "public highways" are often called to discharge noncriminal "community caretaking functions," such as responding to disabled vehicles or investigating accidents. *Id.*, at 441. The question today is whether *Cady*'s acknowledgment of these "caretaking" duties creates a standalone doctrine that justifies warrantless searches and seizures in the home. It does not.

I

During an argument with his wife at their Rhode Island home, Edward Caniglia (petitioner) retrieved a handgun from the bedroom, put it on the dining room table, and asked his wife to "shoot [him] now and get it over with." She declined, and instead left to spend the night at a hotel. The next morning, when petitioner's wife discovered that she could not reach him by telephone, she called the police (respondents) to request a welfare check.

Respondents accompanied petitioner's wife to the home, where they encountered petitioner on the porch. Petitioner spoke with respondents and confirmed his wife's account of the argument, but denied that he was suicidal. Respondents, however, thought that petitioner posed a risk to himself or others. They called an ambulance, and petitioner agreed to go to the hospital for a psychiatric evaluation— but only after respondents allegedly promised not to confiscate his firearms. Once the ambulance had taken petitioner away, however, respondents seized the weapons. Guided by petitioner's wife—whom they allegedly misinformed about his wishes—respondents entered the home and took two handguns.

Petitioner sued, claiming that respondents violated the Fourth Amendment when they entered his home and seized him and his firearms without a warrant. The District Court granted summary judgment to respondents, and the First Circuit affirmed solely on the ground that the decision to remove petitioner and his firearms from the premises fell within a "community caretaking exception" to the warrant requirement. 953 F. 3d 112, 121–123, 131 and nn. 5, 9 (2020). Citing this Court's statement in *Cady* that police officers often have noncriminal reasons to interact with motorists on "public highways," 413 U. S., at 441, the First Circuit extrapolated a freestanding community-caretaking exception that applies to both cars and homes. 953 F. 3d, at 124 ("Threats to individual and community safety are not confined to the highways"). Accordingly, the First Circuit saw no need to consider whether anyone had consented to respondents' actions; whether these actions were justified by "exigent circumstances"; or whether any state law permitted this kind of mental-health intervention. *Id.,* at 122– 123. All that mattered was that respondents' efforts to protect petitioner and those around him were "distinct from 'the normal work of criminal investigation,'" fell "within the realm of reason," and generally tracked what the court

viewed to be "sound police procedure." *Id.,* at 123–128, 132–133.  We granted certiorari.  592 U. S. \_\_\_ (2020).

## II

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  The "'very core'" of this guarantee is "'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'"  *Florida* v. *Jardines*, 569 U. S. 1, 6 (2013).

To be sure, the Fourth Amendment does not prohibit all unwelcome intrusions "on private property," *ibid.*—only "unreasonable" ones.  We have thus recognized a few permissible invasions of the home and its curtilage.  Perhaps most familiar, for example, are searches and seizures pursuant to a valid warrant.  See *Collins* v. *Virginia*, 584 U. S. \_\_\_, \_\_\_–\_\_\_ (2018) (slip op., at 5–6).  We have also held that law enforcement officers may enter private property without a warrant when certain exigent circumstances exist, including the need to "'render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'"  *Kentucky* v. *King*, 563 U. S. 452, 460, 470 (2011); see also *Brigham City* v. *Stuart*, 547 U. S. 398, 403–404 (2006) (listing other examples of exigent circumstances).  And, of course, officers may generally take actions that "'any private citizen might do'" without fear of liability.  *E.g., Jardines*, 569 U. S., at 8 (approaching a home and knocking on the front door).

The First Circuit's "community caretaking" rule, however, goes beyond anything this Court has recognized.  The decision below assumed that respondents lacked a warrant or consent, and it expressly disclaimed the possibility that they were reacting to a crime.  The court also declined to consider whether any recognized exigent circumstances were present because respondents had forfeited the point.

Nor did it find that respondents' actions were akin to what a private citizen might have had authority to do if petitioner's wife had approached a neighbor for assistance instead of the police.

Neither the holding nor logic of *Cady* justified that approach. True, *Cady* also involved a warrantless search for a firearm. But the location of that search was an impounded vehicle—not a home—"'a constitutional difference'" that the opinion repeatedly stressed. 413 U. S., at 439; see also *id.,* at 440–442. In fact, *Cady* expressly contrasted its treatment of a vehicle already under police control with a search of a car "parked adjacent to the dwelling place of the owner." *Id.*, at 446–448 (citing *Coolidge* v. *New Hampshire*, 403 U. S. 443 (1971)).

*Cady*'s unmistakable distinction between vehicles and homes also places into proper context its reference to "community caretaking." This quote comes from a portion of the opinion explaining that the "frequency with which . . . vehicle[s] can become disabled or involved in . . . accident[s] on public highways" often requires police to perform noncriminal "community caretaking functions," such as providing aid to motorists. 413 U. S., at 441. But, this recognition that police officers perform many civic tasks in modern society was just that—a recognition that these tasks exist, and not an open-ended license to perform them anywhere.

\*    \*    \*

What is reasonable for vehicles is different from what is reasonable for homes. *Cady* acknowledged as much, and this Court has repeatedly "declined to expand the scope of . . . exceptions to the warrant requirement to permit warrantless entry into the home." *Collins*, 584 U. S., at ___ (slip op., at 8). We thus vacate the judgment below and remand for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———

No. 20–157

———

## EDWARD A. CANIGLIA, PETITIONER *v.* ROBERT F. STROM, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[May 17, 2021]

CHIEF JUSTICE ROBERTS, with whom JUSTICE BREYER joins, concurring.

Fifteen years ago, this Court unanimously recognized that "[t]he role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties." *Brigham City* v. *Stuart*, 547 U. S. 398, 406 (2006). A warrant to enter a home is not required, we explained, when there is a "need to assist persons who are seriously injured or threatened with such injury." *Id.,* at 403; see also *Michigan* v. *Fisher*, 558 U. S. 45, 49 (2009) (*per curiam*) (warrantless entry justified where "there was an objectively reasonable basis for believing that medical assistance was needed, or persons were in danger" (internal quotation marks omitted)). Nothing in today's opinion is to the contrary, and I join it on that basis.

# SUPREME COURT OF THE UNITED STATES

---

No. 20–157

---

## EDWARD A. CANIGLIA, PETITIONER *v.* ROBERT F. STROM, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[May 17, 2021]

JUSTICE ALITO, concurring.

I join the opinion of the Court but write separately to explain my understanding of the Court's holding and to highlight some important questions that the Court does not decide.

1.  The Court holds—and I entirely agree—that there is no special Fourth Amendment rule for a broad category of cases involving "community caretaking."  As I understand the term, it describes the many police tasks that go beyond criminal law enforcement.  These tasks vary widely, and there is no clear limit on how far they might extend in the future.  The category potentially includes any non-law-enforcement work that a community chooses to assign, and because of the breadth of activities that may be described as community caretaking, we should not assume that the Fourth Amendment's command of reasonableness applies in the same way to everything that might be viewed as falling into this broad category.

The Court's decision in *Cady* v. *Dombrowski*, 413 U. S. 433 (1973), did not recognize any such "freestanding" Fourth Amendment category.  See *ante*, at 2, 4.  The opinion merely used the phrase "community caretaking" in passing. 413 U. S., at 441.

2.  While there is no overarching "community caretaking" doctrine, it does not follow that all searches and seizures

conducted for non-law-enforcement purposes must be ana-
lyzed under precisely the same Fourth Amendment rules
developed in criminal cases. Those rules may or may not be
appropriate for use in various non-criminal-law-enforce-
ment contexts. We do not decide that issue today.

3. This case falls within one important category of cases
that could be viewed as involving community caretaking:
conducting a search or seizure for the purpose of preventing
a person from committing suicide. Assuming that peti-
tioner did not voluntarily consent to go with the officers for
a psychological assessment,[1] he was seized and thus sub-
jected to a serious deprivation of liberty. But was this war-
rantless seizure "reasonable"? We have addressed the
standards required by due process for involuntary commit-
ment to a mental treatment facility, see *Addington* v. *Texas*,
441 U. S. 418, 427 (1979); see also *O'Connor* v. *Donaldson*,
422 U. S. 563, 574–576 (1975); *Foucha* v. *Louisiana*, 504
U. S. 71, 75–77, 83 (1992), but we have not addressed
Fourth Amendment restrictions on seizures like the one
that we must assume occurred here, *i.e.*, a short-term sei-
zure conducted for the purpose of ascertaining whether a
person presents an imminent risk of suicide. Every State
has laws allowing emergency seizures for psychiatric treat-
ment, observation, or stabilization, but these laws vary in
many respects, including the categories of persons who may
request the emergency action, the reasons that can justify
the action, the necessity of a judicial proceeding, and the
nature of the proceeding.[2] Mentioning these laws only in
passing, petitioner asked us to render a decision that could

———————

[1] The Court of Appeals assumed petitioner's consent was not voluntary
because the police allegedly promised that they would not seize his guns
if he went for a psychological evaluation. 953 F. 3d 112, 121 (CA1 2020).
The Court does not decide whether this assumption was justified.

[2] See Brief for Petitioner 38–39, n. 4 (gathering state authorities); L.
Hedman et al., State Laws on Emergency Holds for Mental Health Sta-
bilization, 67 Psychiatric Servs. 579 (2016).

call features of these laws into question. The Court appropriately refrains from doing so.

4. This case also implicates another body of law that petitioner glossed over: the so-called "red flag" laws that some States are now enacting. These laws enable the police to seize guns pursuant to a court order to prevent their use for suicide or the infliction of harm on innocent persons. See, *e.g.,* Cal. Penal Code Ann. §§18125–18148 (West Cum. Supp. 2021); Fla. Stat. §790.401(4) (Cum. Supp. 2021); Mass. Gen. Laws Ann., ch. 140, §131T (2021). They typically specify the standard that must be met and the procedures that must be followed before firearms may be seized. Provisions of red flag laws may be challenged under the Fourth Amendment, and those cases may come before us. Our decision today does not address those issues.

5. One additional category of cases should be noted: those involving warrantless, nonconsensual searches of a home for the purpose of ascertaining whether a resident is in urgent need of medical attention and cannot summon help. At oral argument, THE CHIEF JUSTICE posed a question that highlighted this problem. He imagined a situation in which neighbors of an elderly woman call the police and express concern because the woman had agreed to come over for dinner at 6 p.m., but by 8 p.m., had not appeared or called even though she was never late for anything. The woman had not been seen leaving her home, and she was not answering the phone. Nor could the neighbors reach her relatives by phone. If the police entered the home without a warrant to see if she needed help, would that violate the Fourth Amendment? Tr. of Oral Arg. 6–8.

Petitioner's answer was that it would. Indeed, he argued, even if 24 hours went by, the police still could not lawfully enter without a warrant. If the situation remained unchanged for several days, he suggested, the police might be able to enter after obtaining "a warrant for a missing person." *Id.,* at 9.

THE CHIEF JUSTICE's question concerns an important real-world problem. Today, more than ever, many people, including many elderly persons, live alone.[3] Many elderly men and women fall in their homes,[4] or become incapacitated for other reasons, and unfortunately, there are many cases in which such persons cannot call for assistance. In those cases, the chances for a good recovery may fade with each passing hour.[5] So in THE CHIEF JUSTICE's imaginary case, if the elderly woman was seriously hurt or sick and the police heeded petitioner's suggestion about what the Fourth Amendment demands, there is a fair chance she would not be found alive. This imaginary woman may have regarded her house as her castle, but it is doubtful that she would have wanted it to be the place where she died alone and in agony.

Our current precedents do not address situations like this. We have held that the police may enter a home without a warrant when there are "exigent circumstances." *Payton* v. *New York*, 445 U. S. 573, 590 (1980). But circumstances are exigent only when there is not enough time to get a warrant, see *Missouri* v. *McNeely*, 569 U. S. 141, 149 (2013); *Michigan* v. *Tyler*, 436 U. S. 499, 509 (1978), and warrants are not typically granted for the purpose of checking on a person's medical condition. Perhaps States should institute procedures for the issuance of such warrants, but

—————

[3] Dept. of Commerce, Bureau of Census, The Rise of Living Alone, Fig. HH–4 (2020), https://www.census.gov/content/dam/Census/library/visualizations/time-series/demo/families-and-households/hh-4.pdf; Ortiz-Ospina, The Rise of Living Alone (Dec. 10, 2019), https://ourworldindata.org/living-alone; Smith, Cities With the Most Adults Living Alone (May 4, 2020), https://www.self.inc/blog/adults-living-alone.

[4] See B. Moreland, R. Kakara, & A. Henry, Trends in Nonfatal Falls and Fall-Related Injuries Among Adults Aged ≥65 Years—United States, 2012–2018, 69 Morbidity and Mortality Weekly Rep. 875 (2020).

[5] See, *e.g.,* J. Gurley, N. Lum, M. Sande, B. Lo, & M. Katz, Persons Found in Their Homes Helpless or Dead, 334 New Eng. J. Med. 1710 (1996).

ALITO, J., concurring

in the meantime, courts may be required to grapple with the basic Fourth Amendment question of reasonableness.

6. The three categories of cases discussed above are simply illustrative. Searches and seizures conducted for other non-law-enforcement purposes may arise and may present their own Fourth Amendment issues. Today's decision does not settle those questions.

*    *    *

In sum, the Court properly rejects the broad "community caretaking" theory on which the decision below was based. The Court's decision goes no further, and on that understanding, I join the opinion in full.

# SUPREME COURT OF THE UNITED STATES

_____

## No. 20–157

_____

## EDWARD A. CANIGLIA, PETITIONER *v.*
## ROBERT F. STROM, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

### [May 17, 2021]

JUSTICE KAVANAUGH, concurring.

I join the Court's opinion in full. I write separately to underscore and elaborate on THE CHIEF JUSTICE's point that the Court's decision does not prevent police officers from taking reasonable steps to assist those who are inside a home and in need of aid. See *ante,* at 1 (ROBERTS, C. J., concurring). For example, as I will explain, police officers may enter a home without a warrant in circumstances where they are reasonably trying to prevent a potential suicide or to help an elderly person who has been out of contact and may have fallen and suffered a serious injury.

Ratified in 1791 and made applicable to the States in 1868, the Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." As the constitutional text establishes, the "ultimate touchstone of the Fourth Amendment is reasonableness." *Riley* v. *California*, 573 U. S. 373, 381 (2014) (internal quotation marks omitted). The Court has said that a warrant supported by probable cause is ordinarily required for law enforcement officers to enter a home. See U. S. Const., Amdt. 4. But drawing on common-law analogies and a commonsense appraisal of what is "reasonable," the Court has recognized various situations where a warrant is not required. For example, the exigent circumstances doctrine allows officers to enter a

home without a warrant in certain situations, including: to
fight a fire and investigate its cause; to prevent the immi-
nent destruction of evidence; to engage in hot pursuit of a
fleeing felon or prevent a suspect's escape; to address a
threat to the safety of law enforcement officers or the gen-
eral public; to render emergency assistance to an injured
occupant; or to protect an occupant who is threatened with
serious injury.  See *Mitchell* v. *Wisconsin,* 588 U. S. ___, ___
(2019) (plurality opinion) (slip op., at 6); *City and County of
San Francisco* v. *Sheehan,* 575 U. S. 600, 612 (2015); *Ken-
tucky* v. *King,* 563 U. S. 452, 460, 462 (2011); *Michigan* v.
*Fisher,* 558 U. S. 45, 47 (2009) (*per curiam*); *Brigham City*
v. *Stuart,* 547 U. S. 398, 403 (2006); *Minnesota* v. *Olson,* 495
U. S. 91, 100 (1990); *Michigan* v. *Clifford,* 464 U. S. 287,
293, and n. 4 (1984) (plurality opinion); *Mincey* v. *Arizona,*
437 U. S. 385, 392–394 (1978); *Michigan* v. *Tyler,* 436 U. S.
499, 509–510 (1978); *United States* v. *Santana,* 427 U. S.
38, 42–43 (1976); *Warden, Md. Penitentiary* v. *Hayden,* 387
U. S. 294, 298–299 (1967); *Ker* v. *California,* 374 U. S. 23,
40–41 (1963) (plurality opinion).

Over the years, many courts, like the First Circuit in this
case, have relied on what they have labeled a "community
caretaking" doctrine to allow warrantless entries into the
home for a non-investigatory purpose, such as to prevent a
suicide or to conduct a welfare check on an older individual
who has been out of contact.  But as the Court today ex-
plains, any such standalone community caretaking doctrine
was primarily devised for searches of cars, not homes.  *Ante,*
at 3–4; see *Cady* v. *Dombrowski,* 413 U. S. 433, 447–448
(1973).

That said, this Fourth Amendment issue is more labeling
than substance.  The Court's Fourth Amendment case law
already recognizes the exigent circumstances doctrine,
which allows an officer to enter a home without a warrant
if the "exigencies of the situation make the needs of law en-

forcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Brigham City*, 547 U. S., at 403 (internal quotation marks omitted); see also *ante,* at 3. As relevant here, one such recognized "exigency" is the "need to assist persons who are seriously injured or threatened with such injury." *Brigham City*, 547 U. S., at 403; see also *ante,* at 1 (ROBERTS, C. J., concurring). The Fourth Amendment allows officers to enter a home if they have "an objectively reasonable basis for believing" that such help is needed, and if the officers' actions inside the home are reasonable under the circumstances. *Brigham City*, 547 U. S., at 406; see also *Michigan* v. *Fisher*, 558 U. S., at 47–48.

This case does not require us to explore all the contours of the exigent circumstances doctrine as applied to emergency-aid situations because the officers here disclaimed reliance on that doctrine. But to avoid any confusion going forward, I think it important to briefly describe how the doctrine applies to some heartland emergency-aid situations.

As Chief Judge Livingston has cogently explained, although this doctrinal area does not draw much attention from courts or scholars, "municipal police spend a good deal of time responding to calls about missing persons, sick neighbors, and premises left open at night." Livingston, Police, Community Caretaking, and the Fourth Amendment, 1998 U. Chi. Leg. Forum 261, 263 (1998). And as she aptly noted, "the responsibility of police officers to search for missing persons, to mediate disputes, and to aid the ill or injured has never been the subject of serious debate; nor has" the "responsibility of police to provide services in an emergency." *Id.,* at 302.

Consistent with that reality, the Court's exigency precedents, as I read them, permit warrantless entries when police officers have an objectively reasonable basis to believe that there is a current, ongoing crisis for which it is reason-

able to act now. See, *e.g., Sheehan,* 575 U. S., at 612; *Michigan* v. *Fisher,* 558 U. S., at 48–49; *Brigham City,* 547 U. S., at 406–407. The officers do not need to show that the harm has already occurred or is mere moments away, because knowing that will often be difficult if not impossible in cases involving, for example, a person who is currently suicidal or an elderly person who has been out of contact and may have fallen. If someone is at risk of serious harm and it is reasonable for officers to intervene now, that is enough for the officers to enter.

A few (non-exhaustive) examples illustrate the point.

Suppose that a woman calls a healthcare hotline or 911 and says that she is contemplating suicide, that she has firearms in her home, and that she might as well die. The operator alerts the police, and two officers respond by driving to the woman's home. They knock on the door but do not receive a response. May the officers enter the home? Of course.

The exigent circumstances doctrine applies because the officers have an "objectively reasonable basis" for believing that an occupant is "seriously injured or threatened with such injury." *Id.,* at 400, 403; cf. *Sheehan,* 575 U. S., at 612 (officers could enter the room of a mentally ill person who had locked herself inside with a knife). After all, a suicidal individual in such a scenario could kill herself at any moment. The Fourth Amendment does not require officers to stand idly outside as the suicide takes place.[1]

Consider another example. Suppose that an elderly man is uncharacteristically absent from Sunday church services

---

[1] In 2019 in the United States, 47,511 people committed suicide. That number is more than double the number of annual homicides. See Dept. of Health and Human Servs., Centers for Disease Control and Prevention, D. Stone, C. Jones, & K. Mack, Changes in Suicide Rates—United States, 2018–2019, 70 Morbidity and Mortality Weekly Rep. 261, 263 (2021) (MMWR); Dept. of Justice, Federal Bureau of Investigation, Uniform Crime Report, Crime in the United States, 2019, p. 2 (2020).

and repeatedly fails to answer his phone throughout the day and night. A concerned relative calls the police and asks the officers to perform a wellness check. Two officers drive to the man's home. They knock but receive no response. May the officers enter the home? Of course.

Again, the officers have an "objectively reasonable basis" for believing that an occupant is "seriously injured or threatened with such injury." *Brigham City*, 547 U. S., at 400, 403. Among other possibilities, the elderly man may have fallen and hurt himself, a common cause of death or serious injury for older individuals. The Fourth Amendment does not prevent the officers from entering the home and checking on the man's well-being.[2]

To be sure, courts, police departments, and police officers alike must take care that officers' actions in those kinds of cases are reasonable under the circumstances. But both of those examples and others as well, such as cases involving unattended young children inside a home, illustrate the kinds of warrantless entries that are perfectly constitutional under the exigent circumstances doctrine, in my view.

With those observations, I join the Court's opinion in full.

---

[2] In 2018 in the United States, approximately 32,000 older adults died from falls. Falls are also the leading cause of injury for older adults. B. Moreland, R. Kakara, & A. Henry, Trends in Nonfatal Falls and Fall-Related Injuries Among Adults Aged ≥ 65 Years—United States, 2012–2018, 69 MMWR 875 (2020).