**2021 WI App 83**

# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

| | |
|---|---|
| Case No.: | 2020AP1559-CR |

†Petition for Review filed

Complete Title of Case:

**STATE OF WISCONSIN,**

  **PLAINTIFF-RESPONDENT,**

  **V.**

**LAVERNE WARE, JR.,**

  **DEFENDANT-APPELLANT.†**

| | |
|---|---|
| Opinion Filed: | November 4, 2021 |
| Submitted on Briefs: | August 12, 2021 |

| | |
|---|---|
| JUDGES: | Fitzpatrick, Graham, and Nashold, JJ. |
|    Concurred: | |
|    Dissented: | |

| | |
|---|---|
| Appellant<br>ATTORNEYS: | On behalf of the defendant-appellant, the cause was submitted on the briefs of *Michael Covey* of *Covey Law Office*. |
| Respondent<br>ATTORNEYS: | On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Scott E. Rosenow*, assistant attorney general, and *Joshua L. Kaul*, attorney general. |

**COURT OF APPEALS
DECISION
DATED AND FILED**

**November 4, 2021**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP1559-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2016CF408**

**IN COURT OF APPEALS**

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

LAVERNE WARE, JR.,

    DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Dodge County: BRIAN A. PFITZINGER, Judge. *Affirmed*.

Before Fitzpatrick, Graham, and Nashold, JJ.

¶1 FITZPATRICK, J. Laverne Ware appeals a judgment of the Dodge County Circuit Court convicting him of first degree intentional homicide, hiding a corpse with intent to conceal a crime, incest, and possession of a firearm as a felon. Ware was arrested at his residence after law enforcement officers responded to a

911 call from another resident of the home who reported seeing a large amount of blood in the garage. After Ware was taken into custody, one of the officers searched the garage at the residence and discovered a body. In the circuit court, Ware moved to suppress evidence stemming from the search of the garage on the ground that the evidence was the product of an unconstitutional warrantless search. The court denied Ware's motion concluding that the search was justified under the community caretaker exception to the Fourth Amendment's warrant requirement. This matter went to trial, and a jury found Ware guilty on all counts.

¶2　Ware appeals the circuit court's ruling regarding the search. We affirm, but for a reason different than that given by the circuit court. After the circuit court's ruling, the United States Supreme Court held that the community caretaker exception does not authorize the warrantless search of a residence. *Caniglia v. Strom*, 141 S. Ct. 1596, 1600 (2021). Nonetheless, we conclude that the circuit court properly denied Ware's motion to suppress because the search was justified under the emergency aid exception to the Fourth Amendment's warrant requirement.

## BACKGROUND

¶3　The following facts are mostly taken from the transcript of the suppression hearing and are not in dispute.

¶4　Vernon Mickey called 911 to report a possible homicide at his residence in Fox Lake, Wisconsin. Mickey stated on the call that he lived at the residence with his girlfriend and her son, Ware. Mickey continued that he had observed a large amount of blood in the garage and that he believed the blood was

2

that of Ware's girlfriend, S.D.[1]  Mickey suspected that there was a body in the garage, although he admitted in the call that he had not seen a body.  He also stated that S.D. had been missing since the previous night.  Mickey informed the 911 operator that he was currently at a gas station near the residence.

¶5    Deputy Homan and Sergeant Nicholas of the Dodge County Sheriff's Office were dispatched to the address of the residence, and Officer White of the Randolph Police Department was dispatched to meet with Mickey at the gas station. At the residence, Marjorie Jones—Mickey's girlfriend and Ware's mother— answered the door and briefly conversed with Deputy Homan.  Jones confirmed that Ware was her son, but stated that Ware was not in the residence at that moment. Deputy Homan asked if he could inspect the garage and perform a brief walk-through of the residence, but Jones responded that Homan could do so only when Mickey returned.

¶6    Sergeant Nicholas then remained outside the residence while Deputy Homan drove to the gas station where Mickey and Officer White were still located. At the gas station, Mickey informed the two officers that he had looked through a door into the garage at the residence and observed blood coming from the truck parked in the garage, but that he had not seen a body.  Mickey said he believed that "something bad" happened to S.D. because he had seen S.D. the previous night, but he had not seen or heard from her since that time.  Mickey indicated that Ware and S.D. had recently been arguing and "going at it."  Mickey continued that both Jones

---

[1] We refer to the victim as "S.D.," rather than by name, because she was the victim of a crime. *See* WIS. STAT. RULE 809.86(4) (2019-20).  All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

and Ware were presently at the residence, and that Ware had been drinking and had access to a firearm.

¶7 Deputy Homan, Officer White, and Mickey drove back to the residence where Sergeant Nicholas was waiting outside. Jones opened the front door of the residence and allowed Mickey and the three officers to enter. The officers stood in a portion of the living room near the front door and began conversing with Jones. Jones reiterated that Ware was not at the residence. Sergeant Nicholas asked Jones for her consent to search the residence, and Jones refused to consent to a search. Nicholas informed Jones that a search warrant would be sought and that Jones would have to leave the residence so that the officers could secure the premises.

¶8 While the officers and Jones were talking in the living room, Ware suddenly appeared in the living room from around a corner. Dressed in a three-quarter length mink coat and holding his arms out from his body at shoulder height with a cigarette in one hand, Ware stated, "I am the one you are looking for." Deputy Homan and Officer White handcuffed Ware and placed him in Homan's squad car. After placing Ware in the squad car, Officer White remained outside while Deputy Homan returned to the living room to ensure that Jones exited the residence.

¶9 Leading up to the time Ware was taken into custody, the officers had not observed any indications that Mickey, Jones, or Ware had been involved in a struggle or that any other problem had occurred in the residence. Until that point, the officers had received conflicting information from Jones and Mickey regarding Ware's current location and were therefore not sure if Mickey's information regarding the location of a crime was accurate. However, as Sergeant Nicholas

4

testified, Ware's sudden appearance in the living room corroborated Mickey's version of events and increased the likelihood that the residence was the site of criminal activity. As a result, Nicholas believed that there could be a potential victim in the garage of the residence and decided to conduct a search of the garage.

¶10 While Ware was being taken to the squad car, Sergeant Nicholas and Mickey walked from the living room to the kitchen. The kitchen was connected to the garage through an entryway with a windowless metal door. Nicholas asked Mickey to show him where he had looked into the garage, and Mickey responded by opening the metal door. There was a screen door behind the metal door on the same door frame. Looking through the screen door, Nicholas observed a pickup truck parked in the garage and a dark red substance pooled on the floor below the passenger door. Nicholas then entered the garage and observed a deceased person in the front passenger seat of the truck. Nicholas exited the garage, directed that Mickey and Jones be removed from the residence, and searched the main floor of the residence to check for any persons who may have been hidden.

¶11 Sergeant Nicholas did not obtain a search warrant or Jones' consent to search the garage before entering the garage.

¶12 The State charged Ware with one count of first degree intentional homicide, one count of hiding a corpse with intent to conceal a crime, one count of incest,[2] and two counts of possession of a firearm by a felon. Ware moved to suppress evidence obtained from the search of the garage on the ground that the evidence stemmed from a warrantless search in violation of the Fourth

---

[2] Ware had been in a relationship with S.D., his first cousin.

Amendment.[3] The court denied Ware's motion and determined that the search of the garage did not violate the Fourth Amendment because the search was justified under the community caretaker exception to the warrant requirement.

¶13 The matter went to trial, and a jury found Ware guilty on all counts. Ware appeals his judgment of conviction; more specifically, Ware challenges the circuit court's ruling denying his motion to suppress.

## DISCUSSION

¶14 In Ware's brief-in-chief and the State's response brief, the parties primarily dispute the applicability in this situation of the community caretaker exception to the warrant requirement of the Fourth Amendment. However, before Ware could file his reply brief, the United States Supreme Court in *Caniglia*, 141 S. Ct. at 1600, held that the community caretaker exception cannot justify a warrantless search of a residence.[4] In response to *Caniglia*, the State filed a letter of supplemental authority in which the State concedes that the community caretaker exception cannot justify the search of the garage at issue in this action. *See* WIS. STAT. RULE 809.19(10). The letter also advises that the State retains the substance

---

[3] Ware also moved to dismiss the count of incest on the ground that Wisconsin's incest statute is unconstitutional, to dismiss the count of first degree intentional homicide as not transactionally related to the initially charged felony of hiding a corpse, and to dismiss the entire action as a retaliatory prosecution. The court denied each of these motions, and Ware does not appeal those rulings.

[4] The Court held that the community caretaker exception is limited to the context of automobile searches and cannot justify a warrantless search of a residence. *Caniglia v. Strom*, 141 S. Ct. 1596, 1600 (2021). In concurrence, four justices noted that a warrant to search a residence is not required when there is a need to assist a person who is injured. *E.g.*, *id.* at 1603-04 (Kavanaugh, J., concurring) (noting that "emergency-aid situations" authorize the warrantless searches of residences).

of its community caretaker argument from its response brief, but will "relabel[]" that argument as an analysis under the emergency aid exception. In his reply brief, Ware agrees that the garage search cannot be justified under the community caretaker exception, and he disputes the State's argument that the emergency aid exception justifies the search.

¶15 Because the community caretaker exception cannot justify the warrantless search of a home under *Caniglia*, we frame our analysis using the related—but conceptually distinct—emergency aid exception to the warrant requirement of the Fourth Amendment.[5]

¶16 Ware argues that Sergeant Nicholas' search of the garage was not justified under the emergency aid exception, contending that "there was no indication of any ongoing medical emergency that would justify the application of the emergency aid doctrine." For its part, the State argues that the search was justified under the emergency aid exception because Sergeant Nicholas was

---

[5] We emphasize that Wisconsin's community caretaker case law should not be conflated with cases applying the emergency aid exception. *See State v. Pinkard*, 2010 WI 81, ¶26 n.8, 327 Wis. 2d 346, 785 N.W.2d 592 ("[T]he [community caretaker and emergency aid] exceptions are not one and the same. The community caretaker exception does not require the circumstances to rise to the level of an emergency to qualify as an exception to the Fourth Amendment's warrant requirement."). While both exceptions generally relate to situations with persons in need of assistance justifying warrantless searches, the two doctrines have different "intellectual underpinnings." *Id.* (citation omitted). Whereas the community caretaker test focuses more on the *purpose* of police action, the emergency aid exception focuses more on the *urgency* of the police action. *See Sutterfield v. City of Milwaukee*, 751 F.3d 542, 561 (7th Cir. 2014). Accordingly, Wisconsin courts have developed two separate tests for these exceptions. *State v. Matalonis*, 2016 WI 7, ¶31, 366 Wis. 2d 443, 875 N.W.2d 567 (three-part community caretaker test); *State v. Rome*, 2000 WI App 243, ¶16, 239 Wis. 2d 491, 620 N.W.2d 225 (quoting *State v. Boggess*, 115 Wis. 2d 443, 452, 340 N.W.2d 516 (1983)) (two-part emergency aid test).

concerned that there was a person in the garage who needed aid in the form of medical treatment.[6]

¶17    We begin by setting forth our standard of review and governing principles regarding the emergency aid exception.

## I.  Standard of Review and Governing Principles of the Emergency Aid Exception.

¶18    "On review of a circuit court's denial of a suppression motion, we uphold the circuit court's findings of historical fact unless [those] are clearly erroneous, and independently apply constitutional principles to those facts." *State v. Burch*, 2021 WI 68, ¶14, 398 Wis. 2d 1, 961 N.W.2d 314.

¶19    The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *State v. Robinson*, 2010 WI 80, ¶24, 327 Wis. 2d 302, 786 N.W.2d 463 (quoting U.S. CONST. amend. IV).  Because physical entry of the home is deemed "'the chief evil against which the wording of the Fourth Amendment is directed,' warrantless searches of homes are presumptively unreasonable." *Id.* (citations omitted).  Nevertheless, the warrant requirement is subject to a few carefully delineated exceptions. *State v. Boggess*, 115 Wis. 2d 443, 449, 340 N.W.2d 516 (1983).  The State bears the burden of proving that a warrantless search falls within one of these narrowly drawn

---

[6] In the alternative, the State argues that the evidence should not be suppressed because Mickey consented to the search and because the officers would have inevitably discovered the victim's body after obtaining a warrant. We decline to address these arguments because we conclude that the emergency aid exception is sufficient to decide this appeal. *See Barrows v. American Fam. Ins. Co.*, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").

exceptions. *State v. Rome*, 2000 WI App 243, ¶11, 239 Wis. 2d 491, 620 N.W.2d 225.

¶20     One exception to the warrant requirement recognized by our supreme court concerns emergency aid. *Id.*, ¶12 (citing *State v. Pires*, 55 Wis. 2d 597, 201 N.W.2d 153 (1972)). This exception states that the Fourth Amendment does not bar a government official from making a warrantless intrusion "when the official reasonably believes that a person is in need of immediate aid or assistance." *Id.* (citing *Boggess*, 115 Wis. 2d at 450); *see also* *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) ("[L]aw enforcement officers may enter a residence without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."). This exception is based upon the idea that "the preservation of human life is paramount to the right of privacy protected by the fourth amendment." *Rome*, 239 Wis. 2d 491, ¶12.

¶21     Under this exception, "whether a warrantless home entry is justified based on the need to render assistance or prevent harm is judged by an objective test." *State v. Larsen*, 2007 WI App 147, ¶18, 302 Wis. 2d 718, 736 N.W.2d 211. As a result, officers must have "an objectively reasonable basis for believing that a person within [the residence] is in need of immediate aid." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (per curiam) (citations omitted).

¶22     Wisconsin courts apply a two-part test in determining whether the emergency aid exception applies:

> [U]nder the totality of circumstances, a reasonable person would have believed that: (1) there was an immediate need to provide aid or assistance to a person due to actual or threatened physical injury; and (2) that immediate entry into an area in which a person has a reasonable expectation of privacy was necessary in order to provide that aid or assistance.

*Rome*, 239 Wis. 2d 491, ¶16 (quoting *Boggess*, 115 Wis. 2d at 452). The United States Supreme Court has further explained that "[o]fficers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." *Fisher*, 558 U.S. at 49 (citations omitted).

## II. The Warrantless Search Was Justified Under the Emergency Aid Exception.

¶23    We conclude that the State has satisfied its burden of proving that the warrantless search of the garage was justified under the emergency aid exception. Based on the information known at the time of the search,[7] Sergeant Nicholas had an objectively reasonable basis to believe that "there was an immediate need to provide aid or assistance to a person due to actual or threatened physical injury" and "that immediate entry into [the garage] was necessary in order to provide that aid or assistance." *See Rome*, 239 Wis. 2d 491, ¶16 (quoting *Boggess*, 115 Wis. 2d at 452).

¶24    To repeat, the first prong of the emergency aid exception requires that "there was an immediate need to provide aid or assistance to a person due to actual or threatened physical injury." *Id.* The following facts form an objectively reasonable basis for Sergeant Nicholas' decision to search the garage. Mickey stated on the 911 call—and again to the officers in person—that he had observed a large amount of blood coming from a truck parked in the garage at the residence, although he had not seen a person or body in the vehicle. Mickey also informed the

---

[7] The parties dispute the precise timing of the search for purposes of the Fourth Amendment. Ware argues that the search occurred when Sergeant Nicholas asked Mickey to open the windowless metal door to the garage. The State argues that the search occurred once Sergeant Nicholas opened the screen door and entered the garage. We need not resolve this particular dispute. For the reasons described in the main text of this opinion, Sergeant Nicholas was justified in conducting a warrantless search of the garage prior to both events.

officers that Ware and his girlfriend, S.D., had recently been experiencing relationship troubles and Mickey had not seen S.D. since the previous night. Mickey further stated that he thought the blood might be that of S.D. and that Ware might have harmed her. Mickey indicated that Ware was presently at the residence, had been drinking, and had access to a firearm. In addition to Mickey's statements, the officers gathered the following information while at the residence: Jones stated that Ware was not present at the residence; Ware was, in fact, present at the residence, which indicated that Jones had not been truthful about Ware's location; and Ware stated to the officers, "I am the one you are looking for." Indeed, Ware reasonably concedes in briefing in this court that, "[a]dmittedly, the officers would have cause to be suspicious after Ware suddenly appeared" and by then, "the officers had good cause to be suspicious of what they heard from Jones." Taken together, these facts provide an objective foundation on which an officer could reasonably believe that there was a potential victim of a domestic dispute in the garage that was in need of aid or assistance.

¶25 Further, Sergeant Nicholas was justified in relying on Mickey's statements to the officers. Courts have recognized that a "citizen informant"[8] like Mickey may be a credible and reliable source of information. *State v. Anderson*, 2019 WI 97, ¶38, 389 Wis. 2d 106, 935 N.W.2d 285 (holding that "[c]itizen informants are generally considered among the most reliable" type of informant). "[W]hen an average citizen tenders information to the police, the police should be

---

[8] A "citizen informant" is a person "who happen[s] upon a crime or suspicious activity and report[s] it to police." *State v. Anderson*, 2019 WI 97, ¶38, 389 Wis. 2d 106, 935 N.W.2d 285. Wisconsin courts recognize two other types of informants: "confidential informants" and "anonymous informants." *Id.*, ¶37.

permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that such might not be the case."[9] ***State v. Silverstein***, 2017 WI App 64, ¶14, 378 Wis. 2d 42, 902 N.W.2d 550 (quoting ***State v. Kerr***, 181 Wis. 2d 372, 381, 511 N.W.2d 586 (1994)). Mickey's statements were also reliable because Ware's presence at the residence corroborated Mickey's version of events. Once Ware made his appearance at the residence, the officers were able to verify that Mickey was correct about Ware's location and, as a result, could reasonably believe that Mickey may also be correct about the presence of blood and a potential victim in the garage. *See **Boggess***, 115 Wis. 2d at 456-57 ("[B]ecause an informant is right about some things, he is more probably right about other facts." (citations omitted)).

¶26 Moreover, Sergeant Nicholas had an objectively reasonable basis to believe that "there was an immediate need to provide aid or assistance" to the potential victim in the garage identified by Mickey. *See **Rome***, 239 Wis. 2d 491, ¶16 (quoting ***Boggess***, 115 Wis. 2d at 452). Based on Mickey's observation of a large amount of blood in the garage and the officers' observation that neither Mickey, Jones, nor Ware had lost a significant amount of blood, Nicholas could reasonably believe that a victim in the garage was the source of that blood. A large amount of blood reasonably implies that a person requires immediate assistance. *See **State v. Matalonis***, 2016 WI 7, ¶49 n.26, 366 Wis. 2d 443, 875 N.W.2d 567 ("[T]he blood trail and significant amounts of blood that the officers discovered

---

[9] Although the reliability of informants usually "applies to situations involving the traditional probable cause determination, it is also relevant to an analysis of whether a reasonable person would have believed, under the totality of circumstances, that there was an immediate need to render aid or assistance due to actual or threatened physical injury, and that immediate entry was necessary." ***Boggess***, 115 Wis. 2d at 455.

supported the officers' theory that an individual in Matalonis's residence was in need of assistance.").[10] Therefore, under the first prong of the analysis, Nicholas had an objectively reasonable basis to believe that "there was an immediate need to provide aid or assistance to a person due to actual or threatened physical injury." *See Rome*, 239 Wis. 2d 491, ¶16 (quoting *Boggess*, 115 Wis. 2d at 452).

¶27     Under the second prong of the emergency aid exception, Sergeant Nicholas had an objectively reasonable basis to believe that "immediate entry" into the garage was necessary to provide aid or assistance to a person. *See id.* Even though the officers were investigating a potential homicide, Nicholas was not required to rule out the possibility that the person whose blood was seen by Mickey was still alive. *State v. Kraimer*, 99 Wis. 2d 306, 328, 298 N.W.2d 568 (1980) (holding that an emergency existed even though the suspected victim had reportedly died four days earlier). Because Mickey had not reported seeing a body, Nicholas could reasonably believe that the person in the garage may still be alive and that swift action was necessary to assist that person. *See id.* ("Frequently, the report of death proves inaccurate and a spark of life remains, sufficient to respond to emergency police aid." (citation omitted)). As a result, immediate entry into the garage was reasonably necessary to provide medical aid.

¶28     In sum, based on the information known before the search, we conclude that the State satisfied its burden of proving that Sergeant Nicholas' warrantless search of the garage was justified under the emergency aid exception.

---

[10] We recognize that *Matalonis* analyzes the reasonableness of police action under the community caretaker exception rather than the emergency aid exception. Nonetheless, our supreme court's comments about the presence of blood in *Matalonis* are relevant to our analysis of the emergency aid exception because those comments were a part of the supreme court's discussion of whether there was an "objectively reasonable basis for the police to believe an injured individual needed their help." *Matalonis*, 366 Wis. 2d 443, ¶49.

¶29 Ware contends that the emergency aid exception does not justify the search of the garage because the officers lacked sufficient evidence to believe there was an ongoing emergency. Ware contrasts the facts of this case with the facts of *Stuart*. There, officers responded to a complaint of a loud house party and entered the house after looking through a window and observing an altercation. *Stuart*, 547 U.S. at 400-01. The Supreme Court held that the emergency aid exception justified the officers' entry into the house because "the officers had an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning." *Id.* at 406. In the present case, Ware argues that the officers had not seen "anything amiss" when they arrived at the residence. Ware concludes that the search was not justified under the emergency aid exception because, unlike *Stuart*, "there was no indication of any ongoing medical emergency."

¶30 Contrary to Ware's argument, the emergency aid exception does not require that officers personally observe indications of an ongoing medical emergency. For instance, in *Boggess*, a social worker and a police officer entered a home after the social worker received an anonymous call that the children in that home were in danger. *Boggess*, 115 Wis. 2d at 446-47. Even though the government officials had not personally observed any indication of harm to the children before entering the home, our supreme court concluded that a reasonable person could have relied on the anonymous caller's information and "believed that a situation existed requiring an immediate need for aid or assistance due to actual or threatened physical injury to the children." *Id.* at 457; *see also Kraimer*, 99 Wis. 2d at 316-29 (concluding that the emergency aid exception allowed police to enter a home where the police received an anonymous call from a man confessing that he had shot his wife). Similarly, here, Sergeant Nicholas could reasonably rely on the

14

information provided by Mickey to conclude that there was a person in the garage in need of immediate aid. Even though Nicholas had not personally observed any indications of an ongoing medical emergency, our supreme court's decisions in *Boggess* and *Kraimer* confirm that reliable and corroborated information from an informant may justify a warrantless search of a home under the emergency aid exception.

## CONCLUSION

¶31 For the foregoing reasons, the judgment of the circuit court is affirmed.

*By the Court.*—Judgment affirmed.