# COURT OF APPEALS
## DECISION
## DATED AND FILED

## January 22, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos. 2023AP1388-CR**
**2023AP1389-CR**
**STATE OF WISCONSIN**

Cir. Ct. Nos. 2020CF2595
2020CF2688

**IN COURT OF APPEALS**
**DISTRICT I**

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

    V.

ANTHONY DONTE DIXON,

    DEFENDANT-APPELLANT.

APPEALS from judgments of the circuit court for Milwaukee County: MICHAEL J. HANRAHAN, Judge. *Affirmed*.

Before Donald, P.J., Geenen and Colón, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1　PER CURIAM. Anthony Donte Dixon appeals from judgments convicting him of two counts of felon in possession of a firearm and one count of disorderly conduct using a dangerous weapon. Dixon argues that the trial court erred when it denied his motion to suppress. Upon review, we affirm. We conclude that the officers' entry and sweep of Dixon's residence was proper under the emergency aid doctrine, thus, suppression was not warranted.

## BACKGROUND

¶2　This consolidated appeal arises from two trial court cases. In Milwaukee County Circuit Court case No. 2020CF2595, Dixon was charged with two counts of possession of a firearm by a felon and one count of disorderly conduct using a dangerous weapon as a domestic abuse repeater with a domestic abuse modifier. According to the criminal complaint, on July 27, 2020, C.G.H. and her live-in boyfriend, Dixon, got into an argument at their home.[1] During the argument, Dixon lifted up his shirt, revealed a silver firearm on the right side of his waistband, and grabbed the grip of the firearm, which caused C.G.H. to fear for her safety. As C.G.H. attempted to walk away from the residence, she heard a gunshot and saw Dixon with the silver firearm pointing in the air. C.G.H. called 911. Officers responded to the residence and entered believing C.G.H. to be inside. A black firearm was recovered from Dixon's person, and later, after the execution of a search warrant, a silver firearm was located in the residence.[2]

---

[1] Consistent with WIS. STAT. RULE 809.86(4) (2021-22), we refer to the victim using initials. All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] Prior to this incident, Dixon was convicted of a felony and warned that he was prohibited from possessing a firearm.

¶3      In Milwaukee County Circuit Court case No. 2020CF2688, Dixon was initially charged with second-degree recklessly endangering safety using a dangerous weapon, possession of a firearm by a felon, battery, and criminal damage to property.  Subsequently, the second-degree recklessly endangering safety count was amended to disorderly conduct using a dangerous weapon, and a burglary charge was added.  According to the criminal complaint, on July 11, 2020, Dixon went to R.M.K.'s house armed with a silver firearm and punched R.M.K. through the window.  Surveillance video from R.M.K.'s residence showed Dixon then fired a round in the direction of the residences across the street.  R.M.K. allowed Dixon into his residence and Dixon smashed two televisions.  A physical confrontation took place and Dixon left.  The complaint further stated that the silver firearm obtained from the search warrant issued in case No. 2020CF2595 matched Dixon's firearm on the surveillance video from R.M.K.'s residence.

¶4      Dixon filed a motion to suppress in case No. 2020CF2595.  The motion argued that the police illegally entered and searched Dixon's residence before they obtained a search warrant.  As a result, case No. 2020CF2688 was effectively placed on hold as it involved the firearm evidence at issue in the motion to suppress.

¶5      A hearing was held over the course of several days on the motion to suppress.  Officers Thomas Ozelie and Stephen Dombrowski testified for the State.

¶6    Officers Ozelie and Dombrowski testified that on July 27, 2020, around 2:00 p.m., they received a computer-aided dispatch ("CAD") report informing them of a 911 call.[3] According to the report, the caller had stated that her live-in boyfriend, whom she identified as Dixon, was drunk and had "fired shots into the air" at their residence. The report also stated that the caller was scared and had left the residence and was waiting at a nearby gas station. The officers ran Dixon's name, which revealed that he had a felony conviction.

¶7    As the officers drove towards the residence, they received new information. According to the updated CAD report, the caller stated that Dixon "is throwing out her stuff," that she "just gave him money," and that he "is trying to put her out."[4] The caller stated that Dixon had two handguns in the home, one black and one silver, but that she did not see which he had fired into the air.

¶8    Because the update contained new information, including a description of two firearms and the report that Dixon was throwing out the caller's belongings, the officers believed that the caller may have returned to the residence. Officer Ozelie testified that he feared the caller was inside the residence and that someone was potentially hurt based on the allegation that Dixon had fired the gun and there was alcohol involved. Similarly, Officer Dombrowski testified he was worried that the caller might have been shot.

---

[3] Officer Ozelie testified that while CAD reports are not verbatim reports of what a caller says, officers generally expect the reports to contain the most salient and important information from a 911 call.

[4] Officer Ozelie also testified that the update relayed that Dixon was damaging the caller's television. This information is not included in the CAD report entered into evidence.

¶9    When the officers arrived at Dixon's residence, the officers did not see anybody or any belongings outside, but heard "extremely loud music" coming from the residence. Officer Dombrowski testified that due to the volume of the music, "you couldn't hear anything inside" and because this was "boyfriend/girlfriend trouble," there was a probability that "something bad could be happening inside … or had already happened."

¶10    The screen door and the front storm door were open to the residence and Officer Ozelie saw Dixon sitting at his kitchen table. Dixon matched the caller's description "to a T" and Officer Ozelie recognized Dixon from his picture. Officer Ozelie attempted to wave Dixon over to the door, but Dixon used his hand "essentially saying no in a nonverbal way and for us to leave."

¶11    Officers Ozelie and Dombrowski then entered into the residence. Officer Ozelie had a short conversation with Dixon before turning down the music. Soon after, Officer Dombrowski noticed that Dixon had a gun on his right hip and the officers subsequently arrested Dixon. The officers conducted a sweep of the house and found no one else inside. During the sweep, officers observed drugs in plain view in the living room. Based on the drugs and the fact that the caller had stated that Dixon had a second firearm, the officers obtained a search warrant and recovered a second gun.

¶12    The State initially argued that the warrantless entry and sweep was justified by the community caretaker exception, which recognizes that officers may conduct warrantless searches and seizures when "serving as a community caretaker to protect persons and property[.]" *See State v. Pinkard*, 2010 WI 81, ¶14, 327 Wis. 2d 346, 785 N.W.2d 592. However, before the motion was decided, the United States Supreme Court issued an opinion in *Caniglia v. Strom*, which

held that the community caretaker exception did not apply to warrantless searches of the home. ***Id.***, 593 U.S. 194, 196 (2021).

¶13 In light of ***Caniglia***, the State filed a supplemental brief arguing in relevant part that the officers acted in good faith reliance on well-established Wisconsin case law when entering Dixon's residence, thus, suppression was not warranted.[5] Alternatively, the State argued that exigent circumstances and probable cause existed permitting the officers to enter Dixon's residence.

¶14 The State presented additional testimony from Officer Ozelie and Officer Dombrowski. The officers reiterated that they were concerned that the caller or someone else in the residence was harmed.

¶15 After hearing argument from the parties, the trial court denied the motion to suppress. The court found that the officers were acting in a "community caretaker function" and the good faith exception applied. The court credited the officers' testimony that they believed the caller had returned to the residence and they had entered "not only out of concern for the caller but also for Dixon himself or any other person who may be in the residence or potentially involved under these circumstances." The trial court did not address whether there was exigent circumstances or probable cause to enter the residence.

---

[5] *See **State v. Dearborn***, 2010 WI 84, ¶4, 327 Wis. 2d 252, 786 N.W.2d 97 (holding that "where officers conduct a search in objectively reasonable reliance upon clear and settled Wisconsin precedent that is later deemed unconstitutional by the United States Supreme Court," the good faith exception precludes the application of the exclusionary rule).

¶16    A joint trial took place on case Nos. 2020CF2595 and 2020CF2688.[6] During the trial, Dixon entered a guilty plea to one count of felon in possession of a firearm in case No. 2020CF2595. Dixon also entered a guilty plea to one count of felon in possession of a firearm and one count of disorderly conduct with the use of a dangerous weapon in case No. 2020CF2688. The remaining charges were dismissed and read-in. The trial court imposed a total sentence of three years and six months of initial confinement and four years of extended supervision. Dixon now appeals.

## DISCUSSION

¶17    On appeal, Dixon argues that the officers' search was not authorized by the community caretaker exception as it existed at the time and the officers' reliance on it was therefore not objectively reasonable. Dixon additionally argues that the officers' warrantless search of Dixon's residence was not justified under the exigent circumstances exception.

¶18    The State responds that the trial court properly denied Dixon's suppression motion because the officers' entry and sweep of the residence was supported under the emergency aid doctrine. Alternatively, the State contends that the search satisfied the community caretaker exception to the warrant requirement under then-controlling Wisconsin precedent, which the officers relied on in good faith.

---

[6] We note that at the start of the trial, the State dismissed the disorderly conduct count in Milwaukee County Circuit Court case No. 2020CF2595.

7

¶19     We agree with the State that entry into Dixon's residence was justified under the emergency aid doctrine.[7]   Accordingly, because this issue is dispositive, we do not address the community caretaker exception or the exigent circumstances exception.  *See State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989) ("[C]ases should be decided on the narrowest possible ground[.]").

¶20     The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."   A warrantless search of a home is presumptively unreasonable.  *State v. Richter*, 2000 WI 58, ¶28, 235 Wis. 2d 524, 612 N.W.2d 29.  There are, however, certain exceptions to warrantless entries into private residences, such as the emergency aid doctrine.  *Id.*; *State v. Ware*, 2021 WI App 83, ¶20, 400 Wis. 2d 118, 968 N.W.2d 752.

¶21     The emergency aid doctrine provides that the Fourth Amendment does not prevent a government official from making a warrantless entry "when the official reasonably believes that a person is in need of immediate aid or assistance."  *Ware*, 400 Wis. 2d 118, ¶20 (citation omitted).  When determining whether the emergency aid doctrine applies, we examine whether:

> [U]nder the totality of circumstances, a reasonable person would have believed that:  (1) there was an immediate need to provide aid or assistance to a person due to actual or

---

[7] Although the parties and trial court did not address the emergency aid doctrine, we note that the record requires no further factual development with respect to this issue.  Accordingly, we affirm on this ground.  *See State v. Earl*, 2009 WI App 99, ¶18 n.8, 320 Wis. 2d 639, 770 N.W.2d 755 (noting that "we may affirm on different grounds than those relied on by the trial court"); *State v. Holt*, 128 Wis. 2d 110, 124-25, 382 N.W.2d 679 (Ct. App. 1985), *superseded by statute on other grounds* (holding that the forfeiture rule generally does not apply to alternative grounds for affirmance offered by the respondent).

> threatened physical injury; and (2) that immediate entry into an area in which a person has a reasonable expectation of privacy was necessary in order to provide that aid or assistance.

*Id.*, ¶22 (citation omitted; brackets in original). It is the State's burden to demonstrate that the emergency aid doctrine applies. *Id.*, ¶19.

¶22 When reviewing an order denying a motion to suppress, we will uphold the trial court's factual findings unless they are clearly erroneous. *State v. Robinson*, 2010 WI 80, ¶22, 327 Wis. 2d 302, 786 N.W.2d 463. We independently determine whether those facts satisfy constitutional principles. *Id.*

¶23 Here, the 911 caller reported that her live-in boyfriend, Dixon, was drunk and had fired his gun into the air. The caller initially reported that she had fled the scene and was at a gas station. As the officers were in transit, however, they received an updated CAD report with new information from the caller indicating that Dixon was "throwing out her stuff," she "just gave him money," and that he was "trying to put her out." Based on this new information, the officers reasonably inferred that the caller had returned to the house. This inference was consistent with the officers' duty to protect the public and render aid. *See State v. Mielke*, 2002 WI App 251, ¶8, 257 Wis. 2d 876, 653 N.W.2d 316 (stating that when a police officer is confronted with two reasonable competing inferences, the officer "is entitled to rely on the reasonable inference justifying the search").

¶24 Moreover, based on the information in the CAD report, a reasonable person would have believed that there was an immediate need to provide aid or assistance and that the entry and sweep of the residence was necessary. *See Ware*, 400 Wis. 2d 118, ¶22. As stated above, the caller reported that Dixon was

drinking alcohol, armed, and had engaged in dangerous conduct—he fired one of his two guns into the air—and the caller was scared. The fact that Dixon had fired his gun showed that he was willing to use his firearm. Further, the information that Dixon was "throwing out her stuff," she "just gave him money," and he was "trying to put her out" reasonably allowed the inference that the caller had returned and was inside the residence. While the officers did not see anybody outside or hear any voices, there was extremely loud music coming from the residence, which may have masked that something bad had happened or was happening. Thus, it was objectively reasonable to believe that immediate entry was needed to provide aid or assistance. *Id.* The officers "[did] not need ironclad proof of 'a likely serious, life-threatening' injury[.]" ***Michigan v. Fisher***, 558 U.S. 45, 49 (2009).

¶25 Therefore, under the totality of the circumstances, we conclude that the officers' entry and sweep was justified under the emergency aid doctrine and affirm.

*By the Court.*—Judgments affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.