**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JUNE 8, 2023

_Gonzáles, C.J._
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JUNE 8, 2023

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 101385-0 |
| Respondent, | ) | |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| ULUI LAKEPA TEULILO, | ) | |
| | ) | Filed:  June 8, 2023 |
| Petitioner. | ) | |
| | ) | |

JOHNSON, J.—In this prosecution, interlocutory review was granted, challenging a trial court's denial of a suppression motion of evidence observed during a warrantless entry into a dwelling. The trial court concluded that the entry was justified, applying what cases characterize as the "community caretaking exception" to the warrant requirement, on the basis of rendering emergency aid and conducting a health and safety check. At issue is whether the United States Supreme Court's Fourth Amendment case, *Caniglia v. Strom*, 593 U.S. ___, 141 S. Ct. 1596, 209 L. Ed. 2d 604 (2021), requires us to reevaluate our state constitution

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

article I, section 7 cases recognizing exceptions to the warrant requirement. U.S.

CONST. amend. IV; WASH. CONST. art. I, § 7. The petitioner argues that the United

States Supreme Court invalidates the community caretaking exception to the

warrant requirement as applied to the home, and therefore, under the supremacy

clause, our state cases recognizing a health and safety check exception under the

same doctrine are invalid. We disagree, and affirm the trial court.

## FACTS AND PROCEDURAL HISTORY

On July 25, 2018, at approximately 10:26 a.m., Douglas County Sheriff's

Office Deputy Black was sent to 10 Riverside Place to do a welfare check. The 911

dispatcher advised that a caller, Michael Sines, had reported that Mrs. Peggy

Teulilo did not arrive to pick up his mother that morning for a hair appointment.

Mrs. Teulilo was a caregiver for Mr. Sines's mother. Mr. Sines also informed the

dispatcher that Mrs. Teulilo had been involved in some type of domestic incident

with her husband, Ului Teulilo, the previous day.

Deputy Black checked the Spillman system database[1] and read the call from

Mrs. Teulilo the previous day reporting that Mr. Teulilo had threatened her.

Deputy Black also read about a call from May in which Mrs. Teulilo reported that

Mr. Teulilo had threatened to shoot her and then himself.

---

[1] Spillman is the database that police use to track previous 911 calls and reports attached to people's names, as well as their known contact information.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Deputy Black arrived at the Teulilo residence at 10:46 a.m. The residence is a fifth wheel trailer beside an orchard, with one other home on the property. A Dodge Caravan was parked in the driveway. On arrival, Deputy Black spoke with Earl Wilson, the property owner, who identified the trailer as the Teulilo residence. Deputy Black knocked on the side of the trailer and the door, and announced, "'Sheriff's Office,'" but he received no answer. Clerk's Papers (CP) at 86.

Deputy Black then spoke with Mr. Wilson again, and Mr. Wilson said that he knew Mr. Teulilo worked at WW Pumping and would call him. After a couple attempts, Deputy Black was able to reach Mr. Teulilo at his employer's phone number. Deputy Black explained that he needed to speak with Mrs. Teulilo and asked if Mr. Teulilo knew where she was. Mr. Teulilo said that Mrs. Teulilo should be at work at the Sines residence. When asked about the Dodge Caravan in the driveway, Mr. Teulilo confirmed it belonged to Mrs. Teulilo. Mr. Teulilo also provided a phone number for Mrs. Teulilo. Deputy Black did not inform Mr. Teulilo that Mrs. Teulilo was missing, nor did he ask Mr. Teulilo to come home or whether he could check the residence.

Deputy Black called Mrs. Teulilo's phone number several times. He also checked Spillman for other numbers associated with Mrs. Teulilo and called those, with no answer. Deputy Black stood next to the trailer while calling the numbers, and could not hear any phone ringing inside.

3

*State v. Teulilo*, No. 101385-0

Deputy Black then called his supervisor, Sergeant Caille, to inform him of the situation and get advice on what to do next. Sergeant Caille advised Deputy Black to check if the front door was locked and, if not, to open the door and announce, "[S]heriff's [O]ffice." CP at 87. Prior to checking the door, Deputy Black called Sines, who told him that Mrs. Teulilo was supposed to pick his mother up for an appointment, and Mrs. Teulilo would normally have called if there was any issue and she could not make it. Sines also reported that he had recently returned a pistol to Mrs. Teulilo that belonged to Mr. Teulilo.

Deputy Black then checked the trailer door, finding it unlocked. He opened the door and announced, "[S]heriff's [O]ffice," without entering. CP at 87. He received no response. Deputy Black called Sergeant Caille again, who directed Deputy Black to enter the residence and perform a "community caretaking" check for Mrs. Teulilo based on the totality of the circumstances. CP at 87. Deputy Black then opened the door, stepped inside, and announced himself. From his position inside the door, Deputy Black looked to the right and saw Mrs. Teulilo lying at the base of the bed with blood on her face and the surrounding area. Deputy Black approached and saw that she was deceased, with significant trauma to her face that he initially thought came from a gunshot wound.

Deputy Black then stepped out of the trailer and called Sergeant Caille again. He retrieved latex gloves and stepped back inside the residence to search for

4

a gun, to see if it was a possible suicide. He observed the room, but he did not touch or move anything. He did not find a gun and exited again. While waiting for law enforcement personnel, Deputy Black put up crime scene tape around the perimeter. He then reentered the trailer and took photos of the scene, again without moving or touching anything.

Two other law enforcement personnel made entries into the home. Chief Groseclose entered the trailer and viewed Mrs. Teulilo's body but did not touch or move anything. Detective DeMyer arrived shortly afterward to get information to prepare a search warrant and, while standing on the porch, reached his camera into the residence and took a photograph toward the bedroom area.

Mr. Teulilo was charged with first and second degree murder. He filed a CrR 3.6 motion, seeking to suppress all observations and evidence found in the trailer, claiming that the officers' warrantless entry was unjustified. In the suppression hearing, Deputy Black emphasized that he did not know what had happened to Mrs. Teulilo on his arrival. He was concerned with her well-being after the report from Sines and was at the residence to check whether she needed assistance. He did not suspect that a crime had occurred, and his intent was to perform a wellness check. Before entering the home, he did not check for Mrs. Teulilo at the neighbor's house on the property.

5

*State v. Teulilo*, No. 101385-0

The trial court entered findings of fact and conclusions of law and denied the motion. Mr. Teulilo sought review by the Court of Appeals, Division Three. The Court of Appeals granted review and then certified the case to this court.[2]

## ISSUES

1.      Does Washington State's version of the community caretaking exception to warrantless searches still apply to residential searches in light of the United States Supreme Court's decision in *Caniglia v. Strom*?

2.      Was the warrantless entry into the Teulilo residence justified under the facts?

## ANALYSIS

Issues of constitutional interpretation are questions of law, which are reviewed de novo. *State v. Robinson*, 171 Wn.2d 292, 301, 253 P.3d 84 (2011). We review the denial of a motion to suppress for substantial evidence supporting the trial court's findings of fact and whether the findings of fact support the trial court's conclusions of law, and we review the trial court's conclusions of law de novo. *State v. Boisselle*, 194 Wn.2d 1, 14, 448 P.3d 19 (2019).

---

[2] Three amicus briefs were submitted. The Washington Association of Criminal Defense Lawyers submitted an amicus brief on behalf of petitioner Ului Teulilo. The Washington Fire Chiefs Association and the Washington Fire Commissioners Association submitted a brief in support of the State of Washington, as did the Washington Association of Prosecuting Attorneys.

*State v. Teulilo*, No. 101385-0

The first question is whether Washington's warrant exceptions have been impacted by the United States Supreme Court's decision in *Caniglia*.

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington State Constitution protect against unreasonable searches and seizures. Under the Fourth Amendment, searches and seizures inside a home without a warrant are presumptively unreasonable. Since the ultimate standard of the Fourth Amendment is "reasonableness," the warrant requirement has certain exceptions. *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006).

Fourth Amendment

The term "community caretaking function" was first coined in the United States Supreme Court case *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973). In *Cady*, an officer searched a wrecked vehicle that had been towed to a storage area, looking for a revolver the officer believed the driver possessed. The police alleged the search was done to prevent the public from gaining access to the weapon in the unguarded vehicle and stated it was standard procedure in their department to do such a search. The United States Supreme Court held that the warrantless search of the vehicle was not a violation of the Fourth or Fourteenth Amendment. The search was found to be reasonable

7

*State v. Teulilo*, No. 101385-0

because the police had exercised a form of custody of the car, which was a hazard

on the road, and the resulting search was standard police procedure.

In *Cady,* the United States Supreme Court reiterated that the ultimate

standard under the Fourth Amendment is reasonableness and clarified that

sometimes police must perform noninvestigatory functions:

> Local police officers, unlike federal officers, frequently investigate
> vehicle accidents in which there is no claim of criminal liability and
> engage in what, for want of a better term, may be described as
> *community caretaking functions*, totally divorced from the detection,
> investigation, or acquisition of evidence relating to the violation of a
> criminal statute.

413 U.S. at 441 (emphasis added).

Following *Cady*, other courts expanded the scope of "community caretaking

function," creating a broad doctrine for warrantless searches and seizures,

eventually applying that doctrine to homes. *See, e.g.*, *Graham v. Barnette*, 970

F.3d 1075 (8th Cir. 2020) (the Eighth Circuit held that officers acted reasonably in

conducting warrantless entry of subject's home under community caretaking

exception to warrant requirement and thus did not violate the Fourth

Amendment), *vacated and remanded*, 141 S. Ct. 2719, *aff'd on remand*, 5 F.4th

872 (2021). And in *Caniglia*, the First Circuit Court of Appeals applied the

community caretaking doctrine to justify warrantless police entry into a home to

seize weapons.

In *Caniglia,* Edward Caniglia had an argument with his wife, during which

he got a handgun and placed it on his dining room table. He asked his wife to

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

"'shoot [him] now and get it over with.'" 141 S. Ct. at 1598 (alteration in original).

Instead, his wife left and spent the night at a hotel. The next morning, the wife called the police to request a welfare check after she could not reach her husband by phone. The officers accompanied Caniglia's wife to their home. They encountered Caniglia on the porch and called an ambulance, believing he posed a risk to himself and others. Caniglia agreed to get a psychiatric evaluation on the condition that the officers not confiscate his firearms. No arrest occurred. Once Caniglia left, the officers entered Caniglia's home and seized his weapons. Caniglia then sued, claiming the officers had violated his Fourth Amendment rights.

The question addressed by the Supreme Court in *Caniglia* was decidedly narrow–whether the "community caretaking" duties acknowledged in *Cady* extend generally to the home. The majority stated succinctly, in a three-page analysis, that it does not. *Caniglia*, 141 S. Ct. at 1598.

The majority opinion continued that despite the limitations of the community caretaking doctrine, the Fourth Amendment prohibits only unreasonable intrusions on private property.

> We have also held that law enforcement officers may enter private property without a warrant when certain exigent circumstances exist, including the need to "'render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" And, of course, officers may generally take actions that "'any private citizen might do'" without fear of liability.

*Caniglia*, 141 S. Ct. at 1599 (citations omitted) (quoting *Kentucky v. King*, 563 U.S. 452, 460, 131 S. Ct. 1849, 179 L. Ed. 2d 865 (2011) (quoting *Stuart*, 547 U.S. at 403); *Florida v. Jardines*, 569 U.S. 1, 8, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013) (quoting *King*, 563 U.S. at 469)). The opinion left intact certain exceptions to the warrant requirement but expressly rejected a general community caretaking exception justifying warrantless entry into homes.

Three separate concurrences were written. Justices Roberts and Breyer agreed in their concurrence that a warrant is not required when there is a need to assist a person who is seriously injured or threatened with such injury. *Caniglia*, 141 S. Ct. at 1600. In a separate concurrence, Justice Alito added that United States Supreme Court precedent has not addressed situations of reported missing persons, leaving courts to grapple with the question of what is reasonable in such situations. Justice Kavanaugh's concurrence underscored that the *Caniglia* decision does not prevent police officers from taking reasonable steps to assist those who are inside a home and need aid, adding that this Fourth Amendment issue is more labeling than substance. *Caniglia*, 141 S. Ct. at 1602-04.

The narrow holding from the *Caniglia* majority is that a standalone community caretaking exception cannot be applied to a home and that any entry must be objectively reasonable under the Fourth Amendment.

10

*State v. Teulilo*, No. 101385-0

Here, the petitioner argues that the United States Supreme Court's decision in *Caniglia* eliminates the community caretaker doctrine as a standalone justification for warrantless entries into a home and that therefore our interpretation of the doctrine must fail. His primary argument is that *Caniglia* overrules Washington's health and safety prong of the community caretaking exception. Pet'r's Suppl. Mem. at 10-12.

The petitioner also argues that because the United States Supreme Court case has emphasized the difference between a home and a car, and Washington's cases have made no such delineation, this court must modify the last two prongs of the emergency aid exception rule to read as follows:

> (2) a reasonable person in the same situation would similarly believe that an emergency existed requiring that he or she provide immediate assistance to protect or preserve life or property, or to prevent serious injury, and (3) the home at issue was the most likely location that emergency assistance or protection from imminent injury was needed after checking other reasonable locations as was possible under the totality of the circumstances.

Pet'r's Suppl. Mem. at 17-18.

The State argues that exigent circumstances still provide an exception to the warrant requirement post-*Caniglia*. While the majority opinion in *Caniglia* could be read as eliminating the historically recognized role of police entering homes to perform health and welfare checks, the three concurring opinions encourage a far less expansive reading of the majority. Between the concurring opinions allowing

11

warrantless entry under exigent circumstances, and the subsequent cases that have continued to apply the exigent circumstances exception, the State argues that Washington's exceptions remain intact. Resp't's Br. at 1-6.

The amicus curiae for the State from the Washington Association of Prosecuting Attorneys (WAPA) also argues that exigent circumstances may render warrantless entry reasonable. Am. Br. of Amicus Curiae WAPA at 5-10. WAPA notes several cases in which the United States Supreme Court approved of the application of the exigent circumstances exception inside a dwelling. *See, e.g.*, *King*, 563 U.S. 452 (warrantless entry into an apartment permissible to prevent the destruction of evidence); *Stuart*, 547 U.S. 398; *Mincey v. Arizona*, 437 U.S. 385, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978) (the entry into a home to search for victims was appropriate, but police overstepped when they stayed to conduct a thorough search over four days without a warrant).[3]

Overall, the petitioner asks that we read *Caniglia* and its application to Washington case law more broadly than necessary. The United States Supreme

---

[3] The United States Supreme Court has continued to allow jurisdictions to analyze whether entry into a home was reasonable under other warrant exceptions post-*Caniglia*. In *Sanders v. United States*, ___ U.S. ___, 141 S. Ct. 1646, 210 L. Ed. 2d 867 (2021), the court vacated the judgment by the Eighth Circuit that entry was justified under the community caretaking doctrine and remanded, with Justice Kavanaugh noting that the court could still analyze the matter under a different warrant exception. On remand, the Eighth Circuit upheld the entry based on the officers' objectively reasonable belief that the residents of the home needed assistance, and the United States Supreme Court denied certiorari. *United States v. Sanders*, 4 F.4th 672 (8th Cir.), *cert. denied*, 142 S. Ct. 1161 (2021).

*State v. Teulilo*, No. 101385-0

Court makes clear in *Caniglia* that police acting solely for community caretaking purposes is insufficient *by itself* to excuse the warrant requirements for entry into a home—there must be another reasonable basis for the entry, but entry may still be appropriate in certain circumstances.

The majority and concurring opinions in *Caniglia*, which leave open certain exceptions when entry is justified, support the conclusion that no Fourth Amendment violation occurred in this case. Under the Fourth Amendment, it is sufficient that the officer reasonably believed someone inside was at risk and required intervention. Here, Deputy Black received a report that a woman did not show up for work, he was unable to reach her by phone, he went to her house but received no answer, her car was in the driveway, and her husband confirmed that she should be at work. Deputy Black then opened an unlocked door and stepped inside where he saw Mrs. Teulilo's body in the open. Deputy Black reasonably believed that help was needed and behaved reasonably on entry. No Fourth Amendment violation occurred here because entry was justified under these facts. The officer was conducting a welfare check and the entry was not for investigatory purposes, as the trial court concluded in the findings of fact and conclusions of law.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Teulilo*, No. 101385-0

Article I, Section 7

Our cases applying the requirements of article I, section 7[4] recognize

exceptions to the warrant requirement for entering a home similar to the Fourth

Amendment. Since article I, section 7 expressly protects against invading a home

without authority of law, our analysis, while similar to the Fourth Amendment,

applies a more exacting scrutiny.

This court first looked at the police "community caretaking function" as

applied to a home in *Kalmas v. Wagner*, 133 Wn.2d 210, 943 P.2d 1369 (1997).

While the case did not actually apply the community caretaking function because

the plaintiff had given consent for the police to enter, we did recognize that an

underlying reason for entry under the community caretaking function could be

justified as a health and safety check, and the case established a test for whether

the health and safety check is reasonable. "Whether an encounter made for

noncriminal noninvestigatory purposes is reasonable depends on a balancing of the

individual's interest in freedom from police interference against the public's

interest in having the police perform a 'community caretaking function.'" *Kalmas*,

133 Wn.2d at 216-17 (quoting *State v. Mennegar*, 114 Wn.2d 304, 313, 787 P.2d

---

[4] "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

14

*State v. Teulilo*, No. 101385-0

1347 (1990), *overruled on other grounds by State v. Hill*, 123 Wn.2d 641, 870 P.2d 313 (1994)).

The most frequently cited case from this court regarding "community caretaking function" is *State v. Kinzy*, 141 Wn.2d 373, 5 P.3d 668 (2000). Though the case did not involve a home but involved the stop and search of a person, it offers guidance on how this court has shaped a narrower exception. In *Kinzy,* this court restated the same balancing test for health and safety checks established in *Kalmas*. We also acknowledged a test for emergency aid exceptions, which typically involve circumstances of greater urgency and potentially greater intrusion. We reasoned that the emergency aid exception applies when

> "(1) the officer subjectively believed that someone likely needed assistance for health or safety reasons; (2) a reasonable person in the same situation would similarly believe that there was a need for assistance; and (3) there was a reasonable basis to associate the need for assistance with the place searched."

*Kinzy*, 141 Wn.2d at 386-87 (quoting *State v. Menz*, 75 Wn. App. 351, 354, 880 P.2d 48 (1994), *review denied*, 125 Wn.2d 1021 (1995)). We emphasized that the community caretaking function should be cautiously applied and that police may conduct a noncriminal investigation as long as it is necessary and strictly relevant to performing a caretaking function. *Kinzy*, 141 Wn.2d at 388.

*State v. Thompson*, 151 Wn.2d 793, 92 P.3d 228 (2004), also recognized the community caretaking function as an exception to the warrant requirement for

entry into a home. As in *Kinzy*, we specified that the exception applies when police officers are rendering emergency aid to individuals or making routine checks on health and safety. *Thompson*, 151 Wn.2d at 802. In that case, we concluded that an officer was not properly exercising the community caretaking function when he entered the defendant's trailer to retrieve a jacket for the defendant's friend.

And we upheld limited invasions of constitutionally protected areas to render aid or assistance in *State v. Schultz*, 170 Wn.2d 746, 248 P.3d 484 (2011). We added additional nonexclusive factors that apply to the emergency aid exception test established in *Kinzy*:

> (4) there is an imminent threat of substantial injury to persons or property, (5) state agents must believe a specific person or persons or property is in need of immediate help for health or safety reasons, and (6) the claimed emergency is not a mere pretext for an evidentiary search.

*Schultz*, 170 Wn.2d at 754 (citing *State v. Leffler*, 142 Wn. App. 175, 181, 183, 178 P.3d 1042 (2007)).

In *State v. Smith*, 177 Wn.2d 533, 303 P.3d 1047 (2013) (plurality opinion), we reviewed the emergency exception again, applied to a motel room. We applied three factors for the emergency exception: (1) "a reasonable belief that assistance is immediately required to protect life or property, (2) the search is not primarily motivated by an intent to arrest and seize evidence, and (3) there is probable cause to associate the emergency with the place to be searched." *Smith*, 177 Wn.2d at

16

*State v. Teulilo*, No. 101385-0

541. We also noted that the scope of such a search is limited to what was in plain view when officers entered to perform their emergency aid function.

Our most recent case on the community caretaking exception is *State v. Boisselle*, 194 Wn.2d 1. In this case, we expressly focused on the requirements under article I, section 7. We noted that this court has referred to the community caretaking function from *Cady* and applied similar reasoning to include not just the search and seizure of automobiles but also emergency aid or health and safety checks. *Boisselle*, 194 Wn.2d at 11 (citing *Kinzy*, 141 Wn.2d at 386). In *Boisselle*, we made clearer the tests for emergency aid and health and safety. We stated that the officer's actions must generally be unrelated to the investigation of criminal activity. "Accordingly, a court must determine the threshold question of whether the community caretaking exception was used as a pretext for a criminal investigation before applying the community caretaking exception test." *Boisselle*, 194 Wn.2d at 11 (citing *Kinzy*, 141 Wn.2d at 394).

When determining whether a search is pretextual, the court considers the totality of the circumstances, including the subjective intent of the officer and the objective reasonableness of the officer's actions. *Boisselle*, 194 Wn.2d at 15. Nothing in this opinion overrules or calls into question our decision in *Boisselle.* There, the court made clear that an officer's actions must generally be unrelated to the investigation of criminal activity, and here, we require the same. *Boisselle*

17

*State v. Teulilo*, No. 101385-0

demonstrates the intense factual inquiry that the trial court must undertake in determining pretext—to examine the motives or subjective intent of the officer in light of the totality of the circumstances and to ask whether the officer's actions were objectively reasonable. 194 Wn.2d at 15.

If the warrantless search is unrelated to criminal investigation, courts then determine whether it was a reasonable check on health and safety. We applied the test established in *Kalmas* and *Kinzy*, that reasonableness depends upon a balancing of a citizen's interest in freedom from police intrusion against the public's interest in having the police perform the community caretaking function. If the public's interest outweighs the citizen's private interest, the warrantless entry can be justified under our state constitution. *Boisselle*, 194 Wn.2d at 12.

Lastly, in *Boisselle* we discussed the emergency aid test from *Kinzy*:

Accordingly, we hold that the emergency aid function of the community caretaking exception applies when (1) the officer subjectively believed that an emergency existed requiring that he or she provide immediate assistance to protect or preserve life or property, or to prevent serious injury, (2) a reasonable person in the same situation would similarly believe that there was a need for assistance, and (3) there was a reasonable basis to associate the need for assistance with the place searched.

*Boisselle*, 194 Wn.2d at 14.

Washington case law shows that our exceptions to the warrant requirement, requiring more than just a community caretaking reason for entry, are consistent with the decision in *Caniglia*. In the cases applying article I, section 7, mentioning

18

*State v. Teulilo*, No. 101385-0

the "community caretaking exception," we have discussed that an underlying reason for warrantless entry into the home must exist and be for emergency aid or health and safety check. *See, e.g.*, *Boisselle*, 194 Wn.2d at 11.

In *Caniglia*, the majority recognized that the United States Supreme Court has consistently held that officers may enter a private property without a warrant in order to render emergency aid. What is required is an objectively reasonable need for entry under the Fourth Amendment. *Caniglia*, 141 S. Ct. at 1599; *Stuart*, 547 U.S. at 403; *Mincey*, 437 U.S. at 393-94. The Washington emergency aid exception requires more than Fourth Amendment "reasonableness." Our emergency aid exception requires subjective belief, objective belief, and a reasonable connection between the emergency and the place searched, which must be determined by focusing on the facts of each case.

As to the health and safety check, under *Boisselle*, we have a threshold question for any entry—whether the entry was used as a pretext for a criminal investigation, looking at both the subjective and objective reasonableness. 194 Wn.2d at 15. Courts must then balance the citizen's privacy interest against the public's interest. *Boisselle*, 194 Wn.2d at 12. The Washington health and safety exception also requires more than the Fourth Amendment "reasonableness."

Our conclusion is supported by other state cases analyzing the effect of *Caniglia*, and those cases have continued to recognize certain warrantless entries.

19

*State v. Teulilo*, No. 101385-0

In *State v. Samuolis*, 344 Conn. 200, 216, 278 A.3d 1027 (2022) (quoting *Caniglia*,

141 S. Ct. at 1600 (Roberts, C.J., concurring)), the Supreme Court of Connecticut

stated,

> Significantly for our purposes, the court's majority opinion in
> *Caniglia*, as well as the three concurring opinions, underscored that
> the court's decision was not intended to undermine settled law holding
> that no warrant is required to enter a home when there is a "need to
> assist persons who are seriously injured or threatened with such
> injury."

The Wisconsin Court of Appeals similarly upheld warrantless entry in *State v.*

*Ware*, 400 Wis. 2d 118, 968 N.W.2d 752 (2021). The court continued to apply

their own state's two-part test for the emergency aid exception.

Application

The second question then is whether the warrantless entry into the Teulilo

residence was justified given the facts. As we stated in *Boisselle*, we first answer

the threshold question—whether the entry was unrelated to a criminal

investigation. Such an analysis requires consideration of the totality of the

circumstances, including the officer's subjective intent and whether the actions

were objectively reasonable.

The petitioner argues that the entry was a pretext for investigating a

domestic violence incident. However, nothing in the findings of fact indicate that

Deputy Black knew any crime had occurred before he entered. No crime had been

reported and no evidence of a crime existed on his arrival at the Teulilo house.

20

*State v. Teulilo*, No. 101385-0

The trial court found that Deputy Black's concerns and actions were motivated by a sincere and genuine concern for the victim's health and safety, and his actions were not a pretext for investigation. The trial court made findings supporting the conclusion that Deputy Black's concern for the victim was subjectively reasonable: (1) Mrs. Teulilo's employer reported she had not reported for work, (2) Mr. Teulilo confirmed she should be at work, (3) Mrs. Teulilo was known to normally call her employer if she could not make it to work, but she did not call on this occasion, (4) Mrs. Teulilo made several reports of negative domestic incidents both to law enforcement and to her employer, (5) Mrs. Teulilo was not answering her phone, (6) Mrs. Teulilo's car was parked in the residence driveway, and (7) Mrs. Teulilo was not responding to Deputy Black's announcements and knocks.

The petitioner insists that Deputy Black repeatedly testified that he had no idea if there was anything wrong with Mrs. Teulilo and that he had no idea where she was, thus, he could not have reasonably believed that an emergency existed. While Deputy Black may not have known what happened to Mrs. Teulilo before entering, the petitioner goes too far claiming that Deputy Black did not believe that she may need help. Deputy Black also testified that he was concerned for her safety; that his motivations in searching were to see if she was okay; and that given all the facts, he felt that something could have been wrong with her. As the trial

21

*State v. Teulilo*, No. 101385-0

court concluded, Deputy Black's subjective intent when entering the residence was not to investigate a crime.

For the same reasons given above, the trial court also found that a reasonable person in the same situation would similarly believe that a need for assistance existed and that Deputy Black's entry was objectively reasonable under the totality of the circumstances. We agree. The record establishes that this trial court's factual findings are supported by the testimony and that the conclusions of law are supported by the findings.

From the facts leading to the warrantless entry, Deputy Black did not know whether he would find the victim alive, dead, or in need of medical assistance, or find no one at all. He did not have probable cause to investigate a crime, and no probable cause existed necessary to get a search warrant. Such a situation is why the health and safety check exception exists. We allow police to make reasonable entries to search for reported missing persons so they can potentially provide medical care if needed. Here, there was no pretext for a criminal investigation.

For the health and safety check exception to apply, there must also be a balancing of a citizen's privacy interest in freedom from police intrusion against the public's interest in having the police investigate. If the public's interest outweighs that of the citizen's private interest, the entry is reasonable and permissible under our state constitution. *Boisselle*, 194 Wn.2d at 12. Just because a

22

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Teulilo*, No. 101385-0

crime by one person may be discovered does not mean that that person's interest outweighs the interest of a person who may be the victim or who may be injured. Prior to being found by Deputy Black, a possibility existed that Peggy was alive, injured, and hoping for help. At that point, Peggy had an interest in being found that outweighed Mr. Teulilo's privacy interests.

Balancing interests also requires consideration of the actions taken once inside the home and whether those actions are reasonable. The intrusion in the Teulilo home was minimal. Deputy Black tried the front door, which was unlocked. He took a step into the house and announced himself. Because of the small size of the home, he was able to see nearly the entirety of the home from just inside the door. Deputy Black did not open any doors inside the home or search any closed spaces. Peggy's body was visible in plain view. The trial court concluded that Deputy Black's reentering the residence to look for a gun and take pictures, without moving or touching anything, did not exceed the scope of his initial entry under the plain view doctrine.

A thorough factual inquiry demonstrates that the trial court here entered sufficient findings to support its conclusion that the entry was not a pretext for a criminal investigation.

*State v. Teulilo*, No. 101385-0

## CONCLUSION

We affirm the trial court's decision to deny the motion to suppress and remand.

_____
Johnson, J.

WE CONCUR:

_____
González, C.J.

_____
Madsen, J.

_____
Yu, J.

_____
Owens, J.

_____
Montoya-Lewis, J.

_____
Stephens, J.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Teulilo*, No. 101385-0
Whitener, J., dissenting

No. 101385-0

WHITENER, J. (dissenting) — "'Minutes matter' as it relates to the treatment of many serious health emergencies." Br. of Amicus Curiae (Wash. Fire Chiefs Ass'n & Wash. Fire Comm'n Ass'n) at 13. I concur with the majority that Washington State's version of the community caretaking exception to warrantless searches still applies to residential searches in light of the United States Supreme Court's decision in *Caniglia v. Strom*, 593 U.S. ___, 141 S. Ct. 1596, 209 L. Ed. 2d 604 (2021). However, in health and safety emergencies, mere minutes can be the difference between life and death. Therefore, I cannot agree that under the facts of this case, the warrantless entries into the Teulilo residence were justified under our state's community caretaking exception. Therefore, I respectfully dissent.

ANALYSIS

In Washington, warrantless searches and seizures are per se unreasonable in violation of the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution. U.S. CONST. amend. IV; WASH. CONST. art. I, § 7. A community caretaking search is one of only a few "jealously and carefully drawn exceptions" to the warrant requirement. *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009); *State v. Jones,* 146 Wn.2d 328, 335, 45 P.3d 1062 (2002); *State v. Kinzy*, 141 Wn.2d 373, 384, 5 P.3d 668 (2000). The heavy burden

1

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

of showing that a community caretaking warrantless search falls within one of these exceptions is always on the State.

An appellate court reviews a denial of a motion to suppress to determine "whether substantial evidence supports the trial court's findings of fact and whether the findings of fact support the trial court's conclusions of law." *State v. Boisselle*, 194 Wn.2d 1, 14, 448 P.3d 19 (2019) (citing *State v. Russell*, 180 Wn.2d 860, 866, 330 P.3d 151 (2014)). We review the trial court's conclusions of law de novo. *Id*. Generally, findings are viewed as verities on appeal, provided there is substantial evidence to support the findings. *State v. Hill*, 123 Wn.2d 641, 870 P.2d 313 (1994). "Evidence is substantial when it is enough 'to persuade a fair-minded person of the truth of the stated premise.'" *State v. Garvin,* 166 Wn.2d at 249 (quoting *State v. Reid*, 98 Wn. App. 152, 156, 988 P.2d 1038 (1999)).

In this case, the trial court found that at 10:26 a.m., Deputy Black was advised by 911 dispatch of a request for a welfare check on Peggy Teulilo, the petitioner's wife. The reporting party, Mr. Sines, stated that Ms. Teulilo had not arrived to pick up his mother for a hair appointment. Mr. Sines also reported that Ms. Teulilo was involved in a domestic incident the previous day and that she was going to pack up and leave her husband. After receipt of the dispatch request, but before responding,

*State v. Teulilo*, No. 101385-0
Whitener, J., dissenting

Deputy Black checked the Spillman system database,[1] read the call from the previous day and also read another call where Ms. Teulilo reported that Mr. Teulilo had made veiled threats to get a gun and scare her. Deputy Black also read that Ms. Teulilo reported in another call made in May, two months prior, that Mr. Teulilo threatened to shoot her and then himself.

At 10:46 a.m., 20 minutes after receipt of the 911 dispatch for a welfare check, and after obtaining knowledge of the domestic incidences between Ms. Teulilo and her husband, Deputy Black arrived at the reported residence, a fifth wheel trailer approximately 25 feet from another home, all within a fruit orchard. He observed a vehicle parked in front of the residence and spoke with Earl Wilson, the property owner, who verified the fifth wheel trailer as the Teulilo residence. Deputy Black then knocked on the side of the trailer and on the door of the trailer and announced loudly, "Sheriff's Office" several times. When no one answered, Deputy Black then spoke with Mr. Wilson again and explained he needed to speak with Ms. Teulilo.

During his discussion with Deputy Black, Mr. Wilson attempted to call Mr. Teulilo but was unsuccessful. At 10:53 a.m., Deputy Black was able to reach Mr. Teulilo. Deputy Black introduced himself and told Mr. Teulilo he needed to speak with Ms. Teulilo. Mr. Teulilo told Deputy Black that Ms. Teulilo worked for the

---

[1] The Spillman database is a law enforcement database that links an individual's name, address, phone number, and other information law enforcement may add.

3

*State v. Teulilo*, No. 101385-0
Whitener, J., dissenting

Sineses and should be at work and that the Dodge Caravan in the driveway was her vehicle, and he gave a recent phone number for Ms. Teulilo. Deputy Black did not tell Mr. Teulilo about the requested 911 welfare check for Ms. Teulilo.

After speaking with Mr. Teulilo, Deputy Black called Ms. Teulilo's phone number several times with no answer. He then checked Spillman again for other numbers associated with Ms. Teulilo and called those numbers while standing next to the fifth wheel trailer. Deputy Black received no answer from any of the calls and did not hear a phone ring. After unsuccessfully trying to call Ms. Teulilo, Deputy Black called the day shift supervisor, Sergeant Caille, to apprise him of the situation. Sergeant Caille told Deputy Black to check the front door to see if it was locked and, if not, to open the door and announce, "Sheriff's Office," and then to call him back.

Instead of proceeding according to Sergeant Caille's instructions, Deputy Black, for the first time, contacted Mr. Sines, the reporting party. Mr. Sines told Deputy Black that Ms. Teulilo was supposed to pick up his mom to take her to a hair appointment but did not show up and normally would have called if there were issues. Deputy Black then learned that Mr. Sines had recently returned a pistol to Ms. Teulilo that he received from her but that belonged to Mr. Teulilo.

It was at this time Deputy Black checked the door to the residence; found it unlocked; opened the door; announced, "Sheriff's Office"; and received no response. Deputy Black could see only the wall of a hallway. At this point, Deputy Black did

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

not enter the residence but again called Sergeant Caille and advised him of his findings. Deputy Black was then directed to enter the residence and perform a community caretaking check for Ms. Teulilo. Deputy Black then entered the residence and found a deceased female.

I.     Emergency Aid and Exigent Circumstances

The emergency aid exception requires there to be "a present emergency," and this emergency must require immediate assistance "to protect or preserve life or property, or to prevent serious injury." *Boisselle*, 194 Wn.2d at 14. "The emergency aid doctrine is different from the 'exigent circumstances' exception to the warrant requirement." *Kinzy,* 141 Wn.2d at 386 n.39. The exigent circumstances doctrine applies because the officers have an "objectively reasonable basis" for believing that an occupant is "'seriously injured or threatened with such injury.'" *Caniglia*, 141 S. Ct. at 1604 (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006)). Both may require police officers to render aid or assistance, but the emergency aid function, unlike a routine check on health and safety, involves circumstances of greater urgency and searches resulting in greater intrusion. *Kinzy*, 141 Wn.2d at 386.

In *Boisselle* the court clarified "which factors apply when determining whether an officer exercised his or her emergency aid community caretaking function." 194 Wn.2d at 13. The court held that "the emergency aid function of the

*State v. Teulilo*, No. 101385-0
Whitener, J., dissenting

community caretaking exception applies when (1) the officer subjectively believed that an emergency existed requiring that he or she provide immediate assistance to protect or preserve life or property, or to prevent serious injury, (2) a reasonable person in the same situation would similarly believe that there was a need for assistance, and (3) there was a reasonable basis to associate the need for assistance with the place searched." *Id*. at 14.

On the facts of this case, there is nothing Deputy Black learned, saw, or heard prior to his arrival to the dispatched location, in the hour after his arrival at the trailer residence, or prior to his initial entry into the residence that conveyed an immediate need for medical or safety assistance for Ms. Teulilo. Absent from this record is any evidence that any medical, health, or safety emergency was occurring within the trailer residence that required immediate aid or action. Without more, the opposite is true. Deputy Black repeatedly acted without urgency for the well-being of Ms. Teulilo. The evidence in this case is that Deputy Black, after receipt of the 911 dispatch for a welfare check on Ms. Teulilo but prior to arrival at the reported residence, took 20 minutes and checked and verified the domestic incident history at the reported residence involving both residents, learned the domestic incidents were of verbal threats and no reported physical violence, and learned that Ms. Teulilo stated the prior day that she was going to leave her husband. Deputy Black did not

6

*State v. Teulilo*, No. 101385-0
Whitener, J., dissenting

contact the reporting party for more information. Deputy Black did not treat this dispatched call as an emergency dispatch.

Upon arriving at the reported residence, Deputy Black further delayed his initial approach to the trailer residence by again checking the Spillman database. He contacted the property owner, who verified the trailer residence was the Teulilos' residence. Deputy Black then knocked on the side of the trailer and the door, and loudly announced, "Sheriff's Office." There was no response. Deputy Black then spoke to the property owner a second time, obtained Mr. Teulilo's employer's number, spoke with Mr. Teulilo, and obtained a current phone number for Ms. Teulilo. After he concluded his call with Mr. Teulilo, Deputy Black called Ms. Teulilo's phone number several times. There was no response, but Deputy Black did not leave a voicemail or request a callback or response. Deputy Black then again checked the Spillman system database for other numbers associated with Ms. Teulilo and called those numbers. He received no response and again left no voicemails or requests for a callback or response. During this time, Deputy Black stood next to the trailer while calling Ms. Teulilo's number and at no time during this period did Deputy Black hear sounds, a phone ringing, cries, or any noise coming from the trailer residence suggesting there was a need for emergency aid to protect or preserve Ms. Teulilo's life, or to prevent serious injury to Ms. Teulilo.

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Additionally, at this point, Deputy Black had no information that Mr. Teulilo had been physically violent toward Ms. Teulilo. All the prior reports of domestic incidents involved verbal threats and the report from the prior day indicated that Ms. Teulilo would be leaving her husband. Deputy Black did not promptly enter the residence, instead he called his day shift supervisor and apprised him of the situation; he was directed to check to see if the front door of the residence was locked and, if not, to open the door and announce, "Sheriff's Office," and then call his supervisor back. Deputy Black did not immediately follow this directive, and instead, for the very first time, he contacted the reporting party, Mr. Sines. Mr. Sines explained that Ms. Teulilo was supposed to pick up his mother and take her to her hair appointment, but she did not show up. Deputy Black was told that Ms. Teulilo would normally have called if there were any issues and she could not make it. Also, it was during this contact that Deputy Black learned that Mr. Sines recently returned a pistol to Ms. Teulilo that he had received from her and that belonged to Mr. Teulilo. After he received this information about a returned pistol, Deputy Black checked the door of the residence and found it was unlocked. Upon opening the door, Deputy Black saw only the wall of a hallway and without entering announced, "Sheriff's Office." There was no response, and instead of entering because he had some concern for Ms. Teulilo's safety, Deputy Black again called his supervisor and advised him of his

*State v. Teulilo*, No. 101385-0
Whitener, J., dissenting

findings. It was at this point that Deputy Black was directed to enter the residence to perform a "community caretaking check" for Ms. Teulilo.

Where "there was no emergency that necessitated the presence of the deputies inside the residence when they arrived[,] [t]he mere act of calling 911 should not ipso facto entitle police to enter the caller's home." *Kalmas v. Wagner*, 133 Wn.2d 210, 228, 943 P.2d 1369 (1997). Therefore, a warrantless search under the community caretaking exception should require more than just a concern for a person's safety, such as that stated by Deputy Black and accepted by the trial court and the majority. Deputy Black testified "that he was concerned for her safety; that his motivations in searching were to see if she was okay; and that given all the facts, he felt that something *could* have been wrong with her." Majority at 21 (emphasis added). In order to enter a residence without a warrant under the community caretaking exception, there must be a need to "'render emergency assistance to an injured occupant or to protect an occupant from imminent injury,'" or "to render emergency assistance to an injured occupant; or to protect an occupant who is threatened with serious injury." *Caniglia*, 141 S. Ct. at 1599 (internal quotation marks omitted) (quoting *Kentucky v. King*, 563 U.S. 452, 460, 131 S. Ct. 1849, 179 L. Ed. 2d 865 (2011)) , 1603. The exigent circumstances doctrine applies because the officers have an "objectively reasonable basis" for believing that an occupant is "'seriously injured or threatened with such injury.'" *Id*. at 1604 (quoting *Stuart*, 547

9

*State v. Teulilo*, No. 101385-0
Whitener, J., dissenting

U.S. at 403). To allow anything less lowers the heightened requirement the State must prove to justify a warrantless entry into a residence.

Under these facts, it is objectively unreasonable to believe that based on the information Deputy Black obtained prior to entry into the Teulilo residence, Deputy Black reasonably believed that an emergency situation existed where Ms. Teulilo needed immediate aid for medical or safety reasons. Therefore, the emergency aid function test cannot apply to legally justify the warrantless entry and subsequent searches at the Teulilo residence.

II.     Pretext for Criminal Investigation

Deputy Black's warrantless search of the Teulilo residence was a pretext for a criminal investigation. There is substantial evidence there was no present emergency, and Deputy Black's objective actions show he did not subjectively believe that there was a present emergency. In Washington State, reasonable searches and seizures cannot be conducted without a warrant supported by probable cause. RCW 10.79.035, CrR 2.3.

In *Boisselle*, this court held that "in order for the community caretaking exception to apply, a court must first be satisfied that the officer's actions were 'totally divorced' from the detection and investigation of criminal activity." 194 Wn.2d at 11 (citing *Kinzy*, 141 Wn.2d at 385). The court should consider the totality

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Teulilo*, No. 101385-0
Whitener, J., dissenting

of the circumstances, including the subjective intent of the officer and the objective reasonableness of the officer's actions. *Id.* at 15.

A careful review of the findings of fact entered in this case show the trial court's conclusion of law that "Dep[uty] Black's concerns and actions were motivated by a sincere and genuine concern for Peggy's health and safety and were totally divorced from and not a pretext to a criminal investigation," is not supported by substantial evidence. Clerk's Papers (CP) at 68 (conclusion of law 3.5). In fact, the opposite is true.

For the community caretaking exception to apply to a warrantless search, the court must first find that the officer's actions were "*totally* divorced" from the detection and investigation of a crime and should then consider the totality of the circumstances, which includes the subjective intent of the officer and the objective reasonableness of the officer's actions. *Boisselle*, 194 Wn.2d at 11, 15.

Similar to the officers in *Boisselle*, prior to entering the Teulilo residence, Deputy Black had "significant suspicions of criminal activity" from his investigation of the domestic incidences. *Id.* at 4. Here, Deputy Black's subjective intent can be viewed through the objective actions he took in response to the 911 dispatch for a welfare check.

First, before Deputy Black arrived at the Teulilo residence, he looked into the Spillman database and learned of multiple, repeated, previous domestic incident

11

*State v. Teulilo*, No. 101385-0
Whitener, J., dissenting

reports, including prior reports to law enforcement, which included a call the previous day. Deputy Black learned that Ms. Teulilo, the focus of the welfare check, stated that she was going to pack up and leave her husband. Deputy Black also reviewed another prior 911 call where Ms. Teulilo reported her husband had made veiled threats to get a gun and scare her, another call when Mr. Teulilo threatened to shoot Ms. Teulilo, and another call two months prior when Mr. Teulilo threatened to "blow [Ms. Teulilo's] brains out and then kill himself." CP at 86; Verbatim Rep. of Proc. at 12-13, 15, 111, 126.

Once at the Teulilo residence, Deputy Black did not inform anyone that there was concern that Ms. Teulilo may be in danger and that she had missed showing up for work to take her employer to a hair appointment. Instead, he repeatedly stated he needed to speak with her. While outside the trailer residence, Deputy Black heard no sounds coming from the residence, even after repeated knocks, announcements, and phone calls, and he made no inquiries at the only other residence located just 25 feet away. Although Deputy Black spoke with Mr. Teulilo, he did not tell Mr. Teulilo that he was responding to a welfare check request after his wife had missed an appointment. Deputy Black could have but did not ask for permission to enter the residence nor did he request that Mr. Teulilo return to the residence so they could look inside for her. Deputy Black instead withheld information that any reasonable

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Teulilo*, No. 101385-0
Whitener, J., dissenting

person would have shared if attempting to find and ensure the welfare and safety of Ms. Teulilo.

In fact, during his welfare check and after being instructed by his superior officer to open the door to the residence, Deputy Black instead, for the first time, called and spoke with the reporting party, Mr. Sines. It is at this time that Deputy Black learned that Mr. Sines had recently returned a pistol to Ms. Teulilo that he had received from her but that belonged to Mr. Teulilo. It is at this time Deputy Black decided to follow his supervisor's instructions to enter the trailer residence.

Like in *Boisselle*, "[t]aken together, these facts demonstrate that the officer[] [was] suspicious, if not convinced, that a crime had taken place." 194 Wn.2d at 16. Viewing the totality of the circumstances, including what can be inferred of Deputy Black's subjective intent from his actions and words and the objective reasonableness of his actions, substantial evidence in the record shows that during the hour Deputy Black was to be conducting a welfare check on Ms. Teulilo, he did not obtain any information designed to find and ensure her welfare and safety. Rather, he obtained a history of domestic incidents, the most recent occurring the day before, and he conducted a criminal investigation.

As in *Boisselle*, Deputy Black's warrantless search of the Teulilos' home was a pretext for a criminal investigation because Deputy Black had significant

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

information of potential criminal activity, and his entry was motivated by the desire to conduct an evidentiary search, as there was no present emergency. *Id*.

Accordingly, Deputy Black's warrantless search did not fall under the emergency aid function of the community caretaking exception, and it violated article I, section 7 of the Washington Constitution. WASH. CONST. art. I, § 7. Thus, the trial court's findings of fact do not support its conclusions of law, and the trial court erred in denying Mr. Teulilo's motion to suppress.

III. Domestic Incidents and Violence

Mere minutes can be the difference between life and death in domestic incidents and violence. They are health and safety emergencies. However, to avoid pretext intrusions into a home, a reasonableness balancing test is required. *Boisselle*, 194 Wn.2d at 12. The greater the intrusion on a citizen, the greater the justification required for that intrusion to be reasonable.

Domestic violence is the leading cause of injury to women between the ages of 15 and 44 in the United States, more than car accidents, muggings, and rapes combined. *Domestic Violence, Fast Facts of Domestic Violence*, OFF. OF CLARK COUNTY PROSECUTING ATTY. (citing COMM. ON JUDICIARY, U.S. SENATE, VIOLENCE AGAINST WOMEN: A WEEK IN THE LIFE OF AMERICA 3 (Oct. 1992)), http://www.clarkprosecutor.org/html/domviol/facts.htm [https://perma.cc/JUL9-6CRK]. Its impact is significant, and it can impair a victim's ability to function in

14

*State v. Teulilo*, No. 101385-0
Whitener, J., dissenting

daily life, maintain relationships, and keep a job. *Intimate Partner Violence*, U.S.

CTRS. FOR DISEASE CONTROL & PREVENTION,

https://www.cdc.gov/ViolencePrevention/intimatepartnerviolence/index.html

[https://perma.cc/RMR7-WCM5].

It is widely accepted that one of the most dangerous times, with a heightened

risk of injury or death, for a victim of domestic violence is when they try to leave

the relationship. Resp't's Br. at 22. Escaping domestic incidents and violence is

scary and complicated, and may require secrecy in order to successfully escape.

Domestic violence survivors are consistently told to plan and leave *without*

informing their domestic batterer, and many times that includes not telling friends

and family either. *See* Margo Lindauer, "*Please Stop Telling Her to Leave.*" *Where*

*Is the Money: Reclaiming Economic Power To Address Domestic Violence*, 39

SEATTLE U. L. REV. 1263, 1266 (2016); OFF. ON VIOLENCE AGAINST WOMEN, U.S.

DEP'T OF JUST. 2018 BIENNIAL REPORT TO CONGRESS ON THE EFFECTIVENESS OF

GRANT PROGRAMS UNDER THE VIOLENCE AGAINST WOMEN ACT 9,

https://www.vawamei.org/wp-

content/uploads/2020/07/rtc_entire_final_oct2019.pdf [https://ADD6-NJ55].

Under a routine check on safety, "'[w]hether an encounter made for

noncriminal noninvestigatory purposes is reasonable depends on a balancing of the

individual's interest in freedom from police interference against the public's interest

15

*State v. Teulilo*, No. 101385-0
Whitener, J., dissenting

in having the police perform a community caretaking function.'" *Kinzy*, 141 Wn.2d at 387 (alteration in original) (internal quotation marks omitted) (quoting *Kalmas*, 133 Wn.2d at 216-17). We must be cautious in adopting a view that even a reliable domestic incident report alone would be all that is needed to support an objectively reasonable belief that a person has been seriously injured to authorize a warrantless intrusion into a residence.

In this case, there was no emergency that dictated the presence of Deputy Black inside the Teulilo residence. Merely calling 911 for a welfare check should not entitle police to enter someone's home without a warrant. The information Deputy Black obtained in this case showed he investigated the call prior to entering the Teulilo residence. Deputy Black knew the history of domestic incidents, including a phone call by Ms. Teulilo made the day prior; he knew of prior threats made by Mr. Teulilo to shoot his wife, "to blow her brains out and then kill himself"; he knew that in Ms. Teulilo's most recent 911 call that she stated she was going to pack up and leave her husband; and he knew that Ms. Teulilo had missed one appointment, which was unusual. In addition, Deputy Black knew that Ms. Teulilo's car was in the driveway, that she was not answering numerous calls to her phone, and that Ms. Teulilo had recently received a returned pistol belonging to Mr. Teulilo. Yet at no time did Deputy Black believe that he could enter the trailer residence out of concern for Ms. Teulilo until told to do so by his supervisor.

*State v. Teulilo*, No. 101385-0
Whitener, J., dissenting

With all the information Deputy Black knew prior to speaking with his supervisor a second time and then entering the residence, this was not a welfare and safety check covered under the community caretaking exception to the warrant requirement. There was no knowledge of a present or imminent emergency; therefore, Deputy Black was required to obtain a warrant prior to entry into the residence.

An evaluation of the totality of the circumstances and a review of what the officer knew and when he knew it is critical in analyzing a community caretaking exception to the warrant requirement, such as when conducting a welfare check. Mere subjective words from an officer that he was conducting a welfare check, when all of the actions taken by the officer indicate otherwise is relevant. When an officer's response is neither urgent nor imminent, as we have in this case, utilizing the community caretaking exception to the warrantless requirement should not be encouraged.

Deputy Black's warrantless search of the Teulilos' residence was a pretext for a criminal investigation. There was no evidence to persuade a fair-minded person that Ms. Teulilo was hurt or in need of immediate urgent care. Therefore, I would find that the trial court's findings of fact do not support its conclusions of law.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Teulilo*, No. 101385-0
Whitener, J., dissenting

CONCLUSION

Under the facts of this case, I would find the warrantless entries into the Teulilo residence were not reasonable and were not legally justified under the community caretaking function exception. This record does not support the trial court's findings of fact and its conclusions of law. The trial court erred in denying Mr. Teulilo's motion to suppress. I would reverse the trial court's decision and remand for further proceedings.

_____
Whitener, J.

_____
Gordon McCloud, J.

18